CRAWFORD-EL *v.* BRITTON

No. 96–827.   Argued December 1, 1997—Decided May 4, 1998

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*, p. 601. REHNQUIST, C. J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 601. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 611.

*Daniel M. Schember* argued the cause and filed briefs for petitioner.

*Walter A. Smith, Jr.*, Special Deputy Corporation Counsel of the District of Columbia, argued the cause for respondent. With him on the brief were *John M. Ferren*, Corporation Counsel, and *Charles L. Reischel*, Deputy Corporation Counsel.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Acting Solicitor General Waxman, Assistant Attorney General*

*Hunger, Deputy Solicitor General Kneedler, Deputy Assistant Attorney General Preston, Irving L. Gornstein, Barbara L. Herwig,* and *Robert Loeb.**

JUSTICE STEVENS delivered the opinion of the Court.

Petitioner, a long-time prison inmate, seeks damages from a corrections officer based on a constitutional claim that requires proof of improper motive. The broad question presented is whether the courts of appeals may craft special procedural rules for such cases to protect public servants from the burdens of trial and discovery that may impair the performance of their official duties. The more specific question is whether, at least in cases brought by prisoners, the

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Missouri et al. by *Jeremiah W. (Jay) Nixon,* Attorney General of Missouri, *John R. Munich,* Deputy Attorney General, and *Alana M. Barrágan-Scott* and *Gretchen E. Rowan,* Assistant Attorneys General, *Charles H. Troutman,* Acting Attorney General of Guam, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Chris Gorman* of Kentucky, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *Mark W. Barnett* of South Dakota, *Dan Morales* of Texas, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, *Richard Cullen* of Virginia, *Julio A. Brady* of the Virgin Islands, *Darrell V. McGraw, Jr.,* of West Virginia, and *James E. Doyle* of Wisconsin; for the American Civil Liberties Union et al. by *Arthur B. Spitzer* and *Steven R. Shapiro;* and for J. Michael Quinlan et al. by *Michael L. Martinez.*

*Daniel H. Bromberg* and *Paul Michael Pohl* filed a brief for William G. Moore, Jr., as *amicus curiae.*

plaintiff must adduce clear and convincing evidence of improper motive in order to defeat a motion for summary judgment.

I

Petitioner is serving a life sentence in the District of Columbia's correctional system. During his confinement he has filed several lawsuits and has assisted other prisoners with their cases. He has also provided interviews to reporters who have written news stories about prison conditions. He is a litigious and outspoken prisoner.

The events that gave rise to this case occurred in 1988 and 1989. Because of overcrowding in the District of Columbia prison in Lorton, Virginia, petitioner and other inmates were transferred to the county jail in Spokane, Washington. Thereafter, he was moved, first to a Washington State prison, later to a facility in Cameron, Missouri, next back to Lorton, then to Petersburg, Virginia, and ultimately to the federal prison in Marianna, Florida. Three boxes containing his personal belongings, including legal materials, were transferred separately. When the District of Columbia Department of Corrections received the boxes from the Washington State facility, respondent, a District correctional officer, asked petitioner's brother-in-law to pick them up rather than sending them directly to petitioner's next destination. The boxes were ultimately shipped to Marianna by petitioner's mother, at petitioner's expense, but he was initially denied permission to receive them because they had been sent outside official prison channels. He finally recovered the property several months after his arrival in Florida.

Petitioner contends that respondent deliberately misdirected the boxes to punish him for exercising his First Amendment rights and to deter similar conduct in the future. Beyond generalized allegations of respondent's hostility, he alleges specific incidents in which his protected speech had

provoked her.[1]  His claimed injury caused by the delay in receiving his boxes includes the costs of having the boxes shipped and purchasing new clothes and other items in the interim, as well as mental and emotional distress.  Respondent denies any retaliatory motive and asserts that she entrusted the property to petitioner's brother-in-law, who was also a District of Columbia corrections employee, in order to ensure its prompt and safe delivery.

Although the factual dispute is relatively simple, it engendered litigation that has been both protracted and complex. We shall briefly describe the proceedings that led to the en banc Court of Appeals decision that we are reviewing, and then summarize that decision.

*The Early Proceedings*

Petitioner filed suit against respondent and the District of Columbia seeking damages under Rev. Stat. § 1979, 42 U. S. C. § 1983.[2]  The principal theory advanced in his origi-

---

[1] In 1986, petitioner had invited a Washington Post reporter to visit the Lorton prison and obtained a visitor application for the reporter, which resulted in a front-page article on the prison's overcrowding "crisis."  Respondent had approved the visitor application, which did not disclose the visitor's affiliation with the newspaper; she allegedly accused petitioner of tricking her and threatened to make life "as hard for him as possible." App. to Pet. for Cert. 178a.  Petitioner also alleges that when he had complained in 1988 about invasions of privacy, respondent told him, "You're a prisoner, you don't have any rights." *Id.*, at 179a.  Later in 1988, after another front-page Washington Post article quoted petitioner as saying that litigious prisoners had been "handpicked" for transfer to Spokane "so our lawsuits will be dismissed on procedural grounds," respondent allegedly referred to him as a "legal troublemaker." *Id.*, at 180a–181a.

[2] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

nal complaint was that respondent had diverted the boxes containing his legal materials in order to interfere with his constitutional right of access to the courts.

Prior to discovery, respondent, relying in part on a qualified immunity defense, moved for dismissal of the complaint or summary judgment. The motion was denied and respondent appealed, arguing, first, that the complaint did not allege a violation of any constitutional right that was clearly established at the time of her acts; and, second, that the complaint "failed to satisfy the 'heightened pleading standard' that this circuit applies to damage actions against government officials." 951 F. 2d 1314, 1316 (CADC 1991).

The Court of Appeals agreed with petitioner that his constitutional right of access to the courts was well established in 1989, and that his allegations of wrongful intent were sufficiently detailed and specific to withstand a motion to dismiss even under the Circuit's "heightened pleading standard." *Id.*, at 1318, 1321. The court concluded, however, that the allegations of actual injury to his ability to litigate were insufficient under that standard; accordingly, the complaint should have been dismissed. *Id.*, at 1321–1322. Because the contours of the pleading standard had been clarified in a decision announced while the case was on appeal, see *Hunter v. District of Columbia*, 943 F. 2d 69 (CADC 1991), the court concluded that petitioner should be allowed to replead.

On remand, petitioner filed an amended complaint adding more detail to support his access claim and also adding two new claims: a due process claim and the claim that respondent's alleged diversion of his property was motivated by an

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

Only the claim against respondent is before us. The Court of Appeals did not consider whether petitioner's amended complaint stated a cause of action against the District.

intent to retaliate against him for exercising his First Amendment rights. The District Court dismissed the amended complaint because the court access claim and the due process claim were legally insufficient, and because the First Amendment retaliation claim did not allege "direct evidence of unconstitutional motive." 844 F. Supp. 795, 802 (DC 1994). The dismissal was, in effect, mandated by prior decisions of the Court of Appeals holding that allegations of circumstantial evidence of such a motivation were insufficient to withstand a motion to dismiss. See *Martin* v. *D. C. Metropolitan Police Department*, 812 F. 2d 1425, 1435 (1987); *Siegert* v. *Gilley*, 895 F. 2d 797, 800–802 (1990), aff'd on other grounds, 500 U. S. 226 (1991).

*The En Banc Proceeding*

A panel of the Court of Appeals affirmed the dismissal of the first two claims but suggested that the entire court should review the dismissal of the First Amendment retaliation claim. Accordingly, the en banc court ordered the parties to file briefs addressing five specific questions, two of which concerned the power of the Circuit to supplement the Federal Rules of Civil Procedure with special pleading requirements for plaintiffs bringing civil rights claims against government officials,[3] and two of which concerned possible special grounds for granting defense motions for summary judgment in cases "where the unlawfulness depends on the

---

[3] The first two questions asked:

"1. In cases where plaintiffs bring civil rights claims against Government officials who assert qualified immunity, may this circuit supplement the Federal Rules of Civil Procedure by requiring plaintiffs to satisfy a heightened pleading requirement in their complaint or face dismissal prior to discovery? If so, should it be done?

"2. May this circuit require that plaintiffs who allege that Government officials acted with unconstitutional intent plead direct, as opposed to circumstantial evidence of that intent? If so, should it be done?" App. to Pet. for Cert. 108a.

actor's unconstitutional motive."[4]   The fifth was a catchall question that asked the parties whether there are "any alternative devices which protect defendants with qualified immunity, in cases of constitutional tort depending on the defendant's motive or intent, from the costs of litigation?" App. to Pet. for Cert. 109a.

The en banc court responded to these questions in five separate opinions.   A majority of the judges appear to have agreed on these four propositions: (1) the case should be remanded to the District Court for further proceedings; (2) the plaintiff does not have to satisfy any heightened pleading requirement, and may rely on circumstantial as well as direct evidence;[5] (3) in order to prevail in an unconstitutional-motive case, the plaintiff must establish that motive by clear and convincing evidence; and (4) special procedures to protect defendants from the costs of litigation in

---

[4] The questions regarding summary judgment asked:

"3. In claims of constitutional tort where the unlawfulness depends on the actor's unconstitutional motive and the defendant enjoys qualified immunity, should the court grant a defense motion for summary judgment, made before plaintiff has conducted discovery, if the plaintiff has failed to adduce evidence from which the fact finder could reasonably infer the illicit motive? *See Harlow* v. *Fitzgerald,* 457 U. S. 800, 815–18 (1982); *Elliott* v. *Thomas,* 937 F. 2d 338, 345–46 (7th Cir. 1991)?

"4. In claims of constitutional tort where the unlawfulness depends on the actor's unconstitutional motive and the defendant enjoys qualified immunity, are there any circumstances, apart from national security issues of the sort at stake in *Halperin* v. *Kissinger,* 807 F. 2d 180, 184–85 (D. C. Cir. 1986), where the court should grant a defense motion for summary judgment on a showing by the defendant such that a reasonable jury would necessarily conclude that the defendant's stated motivation 'would have been reasonable'? *Id.* at 188; *see also id.* at 189 (summary judgment warranted where no reasonable jury could find that 'it was objectively unreasonable for the defendants' to be acting for stated, innocent motives)." *Id.,* at 108a–109a.

[5] On this point, the court disavowed its prior direct-evidence rule of *Martin* v. *D. C. Metropolitan Police Department,* 812 F. 2d 1425, 1435 (CADC 1987), and *Siegert* v. *Gilley,* 895 F. 2d 797, 800–802 (CADC 1990), aff'd on other grounds, 500 U. S. 226 (1991).

unconstitutional-motive cases are required by the reasoning in this Court's opinion in *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982).

The primary opinion, written by Judge Williams, announced two principal conclusions: "First, we think *Harlow* allows an official to get summary judgment resolution of the qualified immunity issue, including the question of the official's state of mind, *before* the plaintiff has engaged in discovery on that issue. Second, we believe that unless the plaintiff offers clear and convincing evidence on the state-of-mind issue at summary judgment and trial, judgment or directed verdict (as appropriate) should be granted for the individual defendant." 93 F. 3d 813, 815 (CADC 1996).

Judge Silberman criticized Judge Williams' approach as confusing, *id.*, at 833, and suggested that *Harlow*'s reasoning pointed to a "more straightforward solution," 93 F. 3d, at 834. In his opinion, whenever a defendant asserts a legitimate motive for his or her action, only an objective inquiry into pretextuality should be allowed. "If the facts establish that the purported motivation would have been reasonable, the defendant is entitled to qualified immunity." *Ibid.*

Judge Ginsburg agreed with the decision to impose a clear and convincing standard of proof on the unconstitutional motive issue, but he could not accept Judge Williams' new requirement that the District Court must "grant summary judgment prior to discovery unless the plaintiff already has in hand" sufficient evidence to satisfy that standard. *Id.*, at 839. He described that innovation as "a rather bold intrusion into the district court's management of the fact-finding process" that would result in the defeat of meritorious claims and "invite an increase in the number of constitutional torts that are committed." *Ibid.* He would allow limited discovery on a proper showing before ruling on a summary judgment motion, but noted that in cases involving qualified immunity it would be an abuse of discretion for the trial judge to fail to consider, not only the interests of the parties, "but

also the social costs associated with discovery had against a government official." *Id.*, at 840. With reference to the case at hand, he expressed the view that if petitioner could not show that discovery might reveal more than already appeared in the record, summary judgment would be appropriate without any discovery. *Id.*, at 841–844.

Judge Henderson "fully" endorsed the plurality's new clear and convincing evidence standard, but thought that it was a mistake for her colleagues to hear this case en banc because *the record already made it abundantly clear that petitioner's claim had no merit. Id.*, at 844–845.

Chief Judge Edwards, joined by four other judges, criticized the majority for "'crossing the line between adjudication and legislation.'" *Id.*, at 847 (quoting Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 535 (1947)). He expressed the view that the new evidentiary standards were unauthorized by statute or precedent and "would make it all but certain that an entire category of constitutional tort claims against government officials—whether or not meritorious—would *never* be able to survive a defendant's assertion of qualified immunity." 93 F. 3d, at 847.

The different views expressed in those five opinions attest to the importance of both the underlying issue and a correct understanding of the relationship between our holding in *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), and the plaintiff's burden when his or her entitlement to relief depends on proof of an improper motive. Despite the relative unimportance of the facts of this particular case, we therefore decided to grant certiorari. 520 U. S. 1273 (1997).

## II

The Court of Appeals' requirement of clear and convincing evidence of improper motive is that court's latest effort to address a potentially serious problem: Because an official's

state of mind is "easy to allege and hard to disprove," insubstantial claims that turn on improper intent may be less amenable to summary disposition than other types of claims against government officials. 93 F. 3d, at 816, 821. This category of claims therefore implicates obvious concerns with the social costs of subjecting public officials to discovery and trial, as well as liability for damages. The other Courts of Appeals have also grappled with this problem, but none has adopted a heightened burden of proof. See *id.*, at 851–852, n. 7 (Edwards, C. J., concurring in judgment) (citing cases).

The new rule established in this case is not limited to suits by prisoners against local officials, but applies to all classes of plaintiffs bringing damages actions against any government official, whether federal, state, or local. See *Butz* v. *Economou*, 438 U. S. 478, 500–504 (1978). The heightened burden of proof applies, moreover, to the wide array of different federal law claims for which an official's motive is a necessary element, such as claims of race and gender discrimination in violation of the Equal Protection Clause,[6] cruel and unusual punishment in violation of the Eighth Amendment,[7] and termination of employment based on political affiliation in violation of the First Amendment,[8] as well as retaliation for the exercise of free speech or other constitutional rights.[9] A bare majority of the Court of Appeals regarded this sweeping rule as a necessary corollary to our opinion in *Harlow*.

There is, of course, an important difference between the holding in a case and the reasoning that supports that holding. We shall, therefore, begin by explaining why our hold-

---

[6] *Washington* v. *Davis*, 426 U. S. 229, 239–248 (1976) (race); *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 274 (1979) (gender).

[7] *Farmer* v. *Brennan*, 511 U. S. 825, 835–840 (1994).

[8] *Branti* v. *Finkel*, 445 U. S. 507, 513–517 (1980).

[9] *E. g.*, *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 574 (1968).

ing in *Harlow* does not resolve the issue presented in this case—indeed, it does not even address any question concerning the plaintiff's affirmative case. We shall then consider whether the reasoning in that opinion nevertheless supports the conclusion reached by the Court of Appeals.

### Harlow's Specific Holding

In 1968, A. Ernest Fitzgerald testified before a congressional subcommittee about technical difficulties and excessive costs incurred in the development of a new transport plane. His testimony was widely reported and evidently embarrassed his superiors in the Department of Defense. In 1970, his job as a management analyst with the Department of the Air Force was eliminated in a "departmental reorganization and reduction in force." *Nixon* v. *Fitzgerald*, 457 U. S. 731, 733 (1982). After the conclusion of extended proceedings before the Civil Service Commission in 1973, Fitzgerald filed suit against the President of the United States and some of his aides alleging that they had eliminated his job in retaliation for his testimony. He sought damages on both statutory grounds and "in a direct action under the Constitution." *Id.*, at 748. When his charges were reviewed in this Court, we considered the defendants' claims to immunity in two separate opinions. In *Nixon* v. *Fitzgerald*, we held that a former President is entitled to absolute immunity from damages liability predicated on conduct within the scope of his official duties. *Id.*, at 749. In *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), we held that the senior aides and advisers of the President were not entitled to absolute immunity, *id.*, at 808–813, but instead were protected by a "qualified immunity standard that would permit the defeat of insubstantial claims without resort to trial." *Id.*, at 813.

Our definition of that qualified immunity standard was informed by three propositions that had been established by earlier cases. First, in *Gomez* v. *Toledo*, 446 U. S. 635, 639–

641 (1980), we held that qualified immunity is an affirmative defense and that "the burden of pleading it rests with the defendant." Second, in *Butz* v. *Economou*, 438 U. S., at 503–504, we determined that the scope of that defense was the same in actions against state officials under 42 U. S. C. § 1983 and in actions against federal officials under the Federal Constitution, and that in both types of actions the courts are "competent to determine the appropriate level of immunity." Third, in *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974), we presumed that the defense protects all officers in the executive branch of government performing discretionary functions, *id.*, at 245–248, but held that the presumption was rebuttable, *id.*, at 249–250.

The actual scope of the defense had been the subject of debate within the Court in *Wood* v. *Strickland*, 420 U. S. 308 (1975), a case involving a constitutional claim against the members of a school board. A bare majority in that case concluded that the plaintiff could overcome the defense of qualified immunity in two different ways, either if (1) the defendant "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected," or (2) "he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." *Id.*, at 322. In dissent, Justice Powell argued that the majority's standard was too demanding of public officials, but his proposed standard, like the majority's, included both an objective and a subjective component. In his view, our opinion in *Scheuer* had established this standard: "whether in light of the discretion and responsibilities of his office, and under all of the circumstances as they appeared at the time, the officer acted *reasonably and in good faith*." 420 U. S., at 330 (emphasis added).

In *Harlow*, the Court reached a consensus on the proper formulation of the standard for judging the defense of quali-

fied immunity. Speaking for the Court, Justice Powell announced a single objective standard:

> "Consistently with the balance at which we aimed in *Butz*, we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U. S., at 817–818.

Under that standard, a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense.

Our holding that "bare allegations of malice" cannot overcome the qualified immunity defense did not implicate the elements of the plaintiff's initial burden of proving a constitutional violation. It is obvious, of course, that bare allegations of malice would not suffice to establish a constitutional claim. It is equally clear that an essential element of some constitutional claims is a charge that the defendant's conduct was improperly motivated. For example, A. Ernest Fitzgerald's constitutional claims against President Nixon and his aides were based on the theory that they had retaliated against him for speaking out on a matter of public concern.[10] Our consideration of the immunity issues in both the *Nixon*

---

[10] The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right. *Pickering*, 391 U. S., at 574. Retaliation is thus akin to an "unconstitutional condition" demanded for the receipt of a government-provided benefit. See *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972).

case and in *Harlow* itself assumed that Fitzgerald would be entitled to prevail but for the immunity defenses.[11] Thus, although evidence of improper motive is irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case. Our holding in *Harlow*, which related only to the scope of an affirmative defense, provides no support for making any change in the nature of the plaintiff's burden of proving a constitutional violation.

Nevertheless, the en banc court's ruling makes just such a change in the plaintiff's cause of action. The court's clear and convincing evidence requirement applies to the plaintiff's showing of improper intent (a pure issue of fact), not to the separate qualified immunity question whether the official's alleged conduct violated clearly established law, which is an "essentially legal question." *Mitchell* v. *Forsyth*, 472 U. S. 511, 526–529 (1985); see *Gomez*, 446 U. S., at 640 ("[T]his Court has never indicated that qualified immunity is relevant to the existence of the plaintiff's cause of action"). Indeed, the court's heightened proof standard logically should govern even if the official never asserts an immunity defense. See 93 F. 3d, at 815, 838. Such a rule is not required by the holding in *Harlow*.

---

[11] See *Siegert* v. *Gilley*, 500 U. S. 226, 232 (1991) (observing that "the determination of whether the plaintiff has asserted a violation of a constitutional right at all" is a "necessary concomitant" to the threshold immunity question). Indeed, when JUSTICE GINSBURG was a judge on the District of Columbia Circuit, she commented:

"Had the Court [in *Harlow*] intended its formulation of the qualified immunity defense to foreclose *all* inquiry into the defendants' state of mind, the Court might have instructed the entry of judgment for defendants Harlow and Butterfield on the constitutional claim without further ado. In fact, the Court returned the case to the district court in an open-ended remand, a disposition hardly consistent with a firm intent to delete the state of mind inquiry from every constitutional tort calculus." *Martin*, 812 F. 2d, at 1432.

This correct understanding explains why *Harlow* does not support the change in the law advocated by THE CHIEF JUSTICE, *post*, at 602.

## The Reasoning in Harlow

Two reasons that are explicit in our opinion in *Harlow*, together with a third that is implicit in the holding, amply justified *Harlow*'s reformulation of the qualified immunity defense. First, there is a strong public interest in protecting public officials from the costs associated with the defense of damages actions.[12] That interest is best served by a defense that permits insubstantial lawsuits to be quickly terminated. Second, allegations of subjective motivation might have been used to shield baseless lawsuits from summary judgment. 457 U. S., at 817–818. The objective standard, in contrast, raises questions concerning the state of the law at the time of the challenged conduct—questions that normally can be resolved on summary judgment. Third, focusing on "the objective legal reasonableness of an official's acts," *id.*, at 819, avoids the unfairness of imposing liability on a defendant who "could not reasonably be expected to anticipate subsequent legal developments, nor . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful," *id.*, at 818.[13] That unfairness may

---

[12] "These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949), cert. denied, 339 U. S. 949 (1950)." *Harlow*, 457 U. S., at 814.

[13] Our opinion in *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974), explicitly identified fairness as an important concern: "This official immunity apparently rested, in its genesis, on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." *Id.*, at 239–240 (footnote omitted). Fairness alone is not, however, a sufficient reason for the immunity defense, and thus does not justify its extension to private parties. *Wyatt* v. *Cole*, 504 U. S. 158, 168 (1992).

be present even when the official conduct is motivated, in part, by hostility to the plaintiff.

This last rationale of fairness does not provide any justification for the imposition of special burdens on plaintiffs who allege misconduct that was plainly unlawful when it occurred. While there is obvious unfairness in imposing liability—indeed, even in compelling the defendant to bear the burdens of discovery and trial—for engaging in conduct that was objectively reasonable when it occurred, no such unfairness can be attributed to holding one accountable for actions that he or she knew, or should have known, violated the constitutional rights of the plaintiff. *Harlow* itself said as much: "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.*, at 818–819; see also *Butz*, 438 U. S., at 506 ("[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law . . .").

The first two reasons underlying our holding in *Harlow*, however, would provide support for a procedural rule that makes it harder for any plaintiff, especially one whose constitutional claim requires proof of an improper motive, to survive a motion for summary judgment. But there are countervailing concerns that must be considered before concluding that the balance struck in the context of defining an affirmative defense is also appropriate when evaluating the elements of the plaintiff's cause of action. In *Harlow*, we expressly noted the need for such a balance "between the evils inevitable in any available alternative." 457 U. S., at 813–814. We further emphasized: "In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Id.*, at 814. Social costs that adequately justified the elimination of the subjective component of an affirmative defense do not necessarily justify serious limitations upon "the only realistic" remedy for the violation of constitutional guarantees.

There are several reasons why we believe that here, unlike *Harlow*, the proper balance does not justify a judicial revision of the law to bar claims that depend on proof of an official's motive. Initially, there is an important distinction between the "bare allegations of malice" that would have provided the basis for rebutting a qualified immunity defense under *Wood* v. *Strickland* and the allegations of intent that are essential elements of certain constitutional claims. Under *Wood*, the mere allegation of intent to cause any "other injury," not just a deprivation of constitutional rights, would have permitted an open-ended inquiry into subjective motivation. 420 U. S., at 322. When intent is an element of a constitutional violation, however, the primary focus is not on any possible animus directed at the plaintiff; rather, it is more specific, such as an intent to disadvantage all members of a class that includes the plaintiff, see, *e. g.*, *Washington* v. *Davis*, 426 U. S. 229, 239–248 (1976), or to deter public comment on a specific issue of public importance. Thus, in *Harlow*, hostility to the content of Fitzgerald's testimony, rather than an intent to cause him harm, was the relevant component of the constitutional claim. In this case, proof that respondent diverted the plaintiff's boxes because she hated him would not necessarily demonstrate that she was responding to his public comments about prison conditions, although under *Wood* such evidence might have rebutted the qualified immunity defense.

Moreover, existing law already prevents this more narrow element of unconstitutional motive from automatically carrying a plaintiff to trial. The immunity standard in *Harlow* itself eliminates all motive-based claims in which the official's conduct did not violate clearly established law. Even when the general rule has long been clearly established (for instance, the First Amendment bars retaliation for protected speech), the substantive legal doctrine on which the plaintiff relies may facilitate summary judgment in two different

ways. First, there may be doubt as to the illegality of the defendant's particular conduct (for instance, whether a plaintiff's speech was on a matter of public concern). See generally *Anderson* v. *Creighton*, 483 U. S. 635, 640–641 (1987). Second, at least with certain types of claims, proof of an improper motive is not sufficient to establish a constitutional violation—there must also be evidence of causation. Accordingly, when a public employee shows that protected speech was a "motivating factor" in an adverse employment decision, the employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct. *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 287 (1977). Furthermore, various procedural mechanisms already enable trial judges to weed out baseless claims that feature a subjective element, as we explain in more detail in Part IV, *infra*.[14]

Thus, unlike the subjective component of the immunity defense eliminated by *Harlow*, the improper intent element of various causes of action should not ordinarily preclude summary disposition of insubstantial claims. The reasoning in *Harlow*, like its specific holding, does not justify a rule that places a thumb on the defendant's side of the scales when the merits of a claim that the defendant knowingly violated the law are being resolved. And, *a fortiori*, the policy con-

---

[14] These various protections may not entirely foreclose discovery on the issue of motive, and the Court of Appeals adopted its heightened proof standard in large part to facilitate the resolution of summary judgment motions before any discovery at all. Discovery involving public officials is indeed one of the evils that *Harlow* aimed to address, but neither that opinion nor subsequent decisions create an immunity from *all* discovery. *Harlow* sought to protect officials from the costs of "broad-reaching" discovery, 457 U. S., at 818, and we have since recognized that limited discovery may sometimes be necessary before the district court can resolve a motion for summary judgment based on qualified immunity. *Anderson* v. *Creighton*, 483 U. S. 635, 646, n. 6 (1987); see also *Mitchell* v. *Forsyth*, 472 U. S. 511, 526 (1985).

cerns underlying *Harlow* do not support JUSTICE SCALIA's unprecedented proposal to immunize all officials whose conduct is "objectively valid," regardless of improper intent, see *post*, at 612 (dissenting opinion).

### III

In fashioning a special rule for constitutional claims that require proof of improper intent, the judges of the Court of Appeals relied almost entirely on our opinion in *Harlow*, and on the specific policy concerns that we identified in that opinion. As we have explained, neither that case nor those concerns warrant the wholesale change in the law that they have espoused. Without such precedential grounding, for the courts of appeals or this Court to change the burden of proof for an entire category of claims would stray far from the traditional limits on judicial authority.

Neither the text of § 1983 or any other federal statute, nor the Federal Rules of Civil Procedure, provide any support for imposing the clear and convincing burden of proof on plaintiffs either at the summary judgment stage or in the trial itself. The same might be said of the qualified immunity defense; but in *Harlow*, as in the series of earlier cases concerning both the absolute and the qualified immunity defenses, we were engaged in a process of adjudication that we had consistently and repeatedly viewed as appropriate for judicial decision—a process "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler* v. *Pachtman*, 424 U. S. 409, 421 (1976); see also *Butz*, 438 U. S., at 503–504; *Wyatt* v. *Cole*, 504 U. S. 158, 170–172 (1992) (KENNEDY, J., concurring).[15] The unprecedented change

---

[15] Though our opinion in *Harlow* was forthright in revising the immunity defense for policy reasons, see *Anderson*, 483 U. S., at 645, that decision nonetheless followed recent Court precedent and simply eliminated one aspect of the established doctrine; it did not create a new immunity standard out of whole cloth.

made by the Court of Appeals in this case, however, lacks any common-law pedigree and alters the cause of action itself in a way that undermines the very purpose of § 1983—to provide a remedy for the violation of federal rights.[16]

In the past, we have consistently declined similar invitations to revise established rules that are separate from the qualified immunity defense. We refused to change the Federal Rules governing pleading by requiring the plaintiff to anticipate the immunity defense, *Gomez*, 446 U. S., at 639–640, or requiring pleadings of heightened specificity in cases alleging municipal liability, *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U. S. 163, 164–169 (1993). We also declined to craft an exception to settled rules of interlocutory appellate jurisdiction and rejected the argument that the policies behind the immunity defense justify interlocutory appeals on questions of evidentiary sufficiency. *Johnson* v. *Jones*, 515 U. S. 304, 317–318 (1995). Our reasons for those unanimous rulings apply with equal force to the imposition of a clear and convincing burden of proof in cases alleging unconstitutional motive.

As we have noted, the Court of Appeals adopted a heightened proof standard in large part to reduce the availability of discovery in actions that require proof of motive. To the extent that the court was concerned with this procedural issue, our cases demonstrate that questions regarding pleading, discovery, and summary judgment are most frequently and most effectively resolved either by the rulemaking process or the legislative process. See, *e. g., Leatherman*, 507 U. S., at 168–169. Moreover, the Court of Appeals' indirect effort to regulate discovery employs a blunt instrument that carries a high cost, for its rule also imposes a heightened standard of proof at trial upon plaintiffs with bona fide con-

---

[16] Ironically, the heightened standard of proof directly limits the availability of the remedy in cases involving the specific evil at which the Civil Rights Act of 1871 (the predecessor of § 1983) was originally aimed—race discrimination. See *Monroe* v. *Pape*, 365 U. S. 167, 174–175 (1961).

stitutional claims. See *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 252–255 (1986).

One particular recent action by Congress highlights our concern with judicial rulemaking to protect officials from damages actions. Both Judge Silberman's opinion below and a brief filed in this Court by 34 States, Guam, and the Virgin Islands suggest that new substantive or procedural rules are warranted because of the very large number of civil rights actions filed by prison inmates. See 93 F. 3d, at 830, 838; Brief for State of Missouri et al. as *Amici Curiae* 12. Arguably, such cases deserve special attention because many of them are plainly frivolous and some may be motivated more by a desire to obtain a "holiday in court," [17] than by a realistic expectation of tangible relief.

Even assuming that a perceived problem with suits by inmates could justify the creation of new rules by federal judges, Congress has already fashioned special rules to cover these cases. The Prison Litigation Reform Act, Pub. L. 104–134, 110 Stat. 1321, enacted in April 1996, contains provisions that should discourage prisoners from filing claims that are unlikely to succeed. Among the many new changes relating to civil suits, the statute requires all inmates to pay filing fees; denies *in forma pauperis* status to prisoners with three or more prior "strikes" (dismissals because a filing is frivolous, malicious, or fails to state a claim upon which relief may be granted) unless the prisoner is "under imminent danger of serious physical injury," § 804(d); bars suits for mental or emotional injury unless there is a prior showing of physical injury; limits attorney's fees; directs district courts to screen prisoners' complaints before docketing and authorizes the court on its own motion to dismiss "frivolous," "malicious," or meritless actions; permits the revocation of good

---

[17] In his dissent in *Harris* v. *Pate*, 440 F. 2d 315 (CA7 1971), Judge Hastings wrote in reference to the "ever increasing volume of frivolous civil actions filed by state custodial prisoners" that "[o]f course, most prisoners would enjoy a holiday in court." *Id.*, at 320.

time credits for federal prisoners who file malicious or false claims; and encourages hearings by telecommunication or in prison facilities to make it unnecessary for inmate plaintiffs to leave prison for pretrial proceedings. See 28 U. S. C. §§ 1346(b)(2), 1915, 1915A, 1932 (1994 ed., Supp. II); 42 U. S. C. § 1997e (1994 ed., Supp. II). Recent statistics suggest that the Act is already having its intended effect.[18]

Most significantly, the statute draws no distinction between constitutional claims that require proof of an improper motive and those that do not. If there is a compelling need to frame new rules of law based on such a distinction, presumably Congress either would have dealt with the problem in the Reform Act, or will respond to it in future legislation.

## IV

In *Harlow*, we noted that a "'firm application of the Federal Rules of Civil Procedure' is fully warranted" and may lead to the prompt disposition of insubstantial claims. 457 U. S., at 819–820, n. 35 (quoting *Butz*, 438 U. S., at 508). Though we have rejected the Court of Appeals' solution, we are aware of the potential problem that troubled the court. It is therefore appropriate to add a few words on some of the existing procedures available to federal trial judges in handling claims that involve examination of an official's state of mind.

When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense. It must

---

[18] Despite the continuing rise in the state and federal prison populations, the number of prisoner civil rights suits filed in federal court dropped from 41,215 in fiscal year 1996 (Oct. 1, 1995–Sept. 30, 1996) to 28,635 in fiscal year 1997 (Oct. 1, 1996–Sept. 30, 1997), a decline of 31 percent. Administrative Office of the United States Courts, L. Mecham, Judicial Business of the United States Courts: 1997 Report of the Director 131–132 (Table C–2A).

exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings. The district judge has two primary options prior to permitting any discovery at all. First, the court may order a reply to the defendant's or a third party's answer under Federal Rule of Civil Procedure 7(a), or grant the defendant's motion for a more definite statement under Rule 12(e). Thus, the court may insist that the plaintiff "put forward specific, non-conclusory factual allegations" that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment. *Siegert* v. *Gilley*, 500 U. S. 226, 236 (1991) (KENNEDY, J., concurring in judgment). This option exists even if the official chooses not to plead the affirmative defense of qualified immunity. Second, if the defendant does plead the immunity defense, the district court should resolve that threshold question before permitting discovery. *Harlow*, 457 U. S., at 818. To do so, the court must determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law.[19] Because the former option of demanding more specific allegations of intent places no burden on the defendant-official, the district judge may choose that alternative before resolving the immunity question, which sometimes requires complicated analysis of legal issues.

If the plaintiff's action survives these initial hurdles and is otherwise viable, the plaintiff ordinarily will be entitled to some discovery. Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery. On its own motion, the trial court

> "may alter the limits in [the Federal Rules] on the number of depositions and interrogatories and may also limit the length of depositions under Rule 30 and the number

---

[19] If the district court enters an order denying the defendant's motion for dismissal or summary judgment, the official is entitled to bring an immediate interlocutory appeal of that legal ruling on the immunity question. *Johnson* v. *Jones*, 515 U. S. 304, 313, 319–320 (1995).

of requests under Rule 36. The frequency or extent of use of the discovery methods otherwise permitted under these rules . . . shall be limited by the court if it determines that . . . (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Rule 26(b)(2).

Additionally, upon motion the court may limit the time, place, and manner of discovery, or even bar discovery altogether on certain subjects, as required "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Rule 26(c). And the court may also set the timing and sequence of discovery. Rule 26(d).

These provisions create many options for the district judge. For instance, the court may at first permit the plaintiff to take only a focused deposition of the defendant before allowing any additional discovery. See, e. g., Martin, 812 F. 2d, at 1437 (opinion of R. B. Ginsburg, J.). Alternatively, the court may postpone all inquiry regarding the official's subjective motive until discovery has been had on objective factual questions such as whether the plaintiff suffered any injury or whether the plaintiff actually engaged in protected conduct that could be the object of unlawful retaliation. The trial judge can therefore manage the discovery process to facilitate prompt and efficient resolution of the lawsuit; as the evidence is gathered, the defendant-official may move for partial summary judgment on objective issues that are potentially dispositive and are more amenable to summary disposition than disputes about the official's intent, which frequently turn on credibility assessments.[20] Of course, the

---

[20] The judge does, however, have discretion to postpone ruling on a defendant's summary judgment motion if the plaintiff needs additional discovery to explore "facts essential to justify the party's opposition." Rule 56(f).

judge should give priority to discovery concerning issues that bear upon the qualified immunity defense, such as the actions that the official actually took, since that defense should be resolved as early as possible. See *Anderson*, 483 U. S., at 646, n. 6.[21]

Beyond these procedures and others that we have not mentioned, summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial. At that stage, if the defendant-official has made a properly supported motion,[22] the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive. *Liberty Lobby*, 477 U. S., at 256–257. Finally, federal trial judges are undoubtedly familiar with two additional tools that are available in extreme cases to protect public officials from undue harassment: Rule 11, which authorizes sanctions for the filing of papers that are frivolous, lacking in factual support, or "presented for any improper purpose, such as to harass"; and 28 U. S. C. § 1915(e)(2) (1994 ed., Supp. II), which authorizes dismissal "at any time" of *in forma pauperis* suits that are "frivolous or malicious."

It is the district judges rather than appellate judges like ourselves who have had the most experience in managing cases in which an official's intent is an element. Given the

---

[21] If the official seeks summary judgment on immunity grounds and the court denies the *motion*, the official can take an immediate interlocutory appeal, even if she has already so appealed a prior order. *Behrens* v. *Pelletier*, 516 U. S. 299, 311 (1996).

[22] "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.* v. *Catrett*, 477 U. S. 317, 323 (1986) (quoting Fed. Rule Civ. Proc. 56(c)).

wide variety of civil rights and "constitutional tort" claims that trial judges confront, broad discretion in the management of the factfinding process may be more useful and equitable to all the parties than the categorical rule imposed by the Court of Appeals.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

Prisoner suits under 42 U. S. C. § 1983 can illustrate our legal order at its best and its worst. The best is that even as to prisoners the government must obey always the Constitution. The worst is that many of these suits invoke our basic charter in support of claims which fall somewhere between the frivolous and the farcical and so foster disrespect for our laws.

We must guard against disdain for the judicial system. As Madison reminds us, if the Constitution is to endure, it must from age to age retain "th[e] veneration which time bestows." James Madison, The Federalist No. 49, p. 314 (C. Rossiter ed. 1961). The analysis by THE CHIEF JUSTICE addresses these serious concerns. I am in full agreement with the Court, however, that the authority to propose those far-reaching solutions lies with the Legislative Branch, not with us.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, dissenting.

The petition on which we granted certiorari in this case presents two questions. The first asks:

"In a case against a government official claiming she retaliated against the plaintiff for his exercise of First Amendment rights, does the qualified immunity doctrine require the plaintiff to prove the official's unconstitu-

tional intent by 'clear and convincing' evidence?" Pet. for Cert. i.

The Court's opinion gives this question an extensive treatment, concluding that our cases applying the affirmative defense of qualified immunity provide no basis for placing "a thumb on the defendant's side of the scales when the merits of a claim that the defendant knowingly violated the law are being resolved." *Ante,* at 593.

The second question presented asks:

> "In a First Amendment retaliation case against a government official, is the official entitled to qualified immunity if she asserts a legitimate justification for her allegedly retaliatory act and that justification would have been a reasonable basis for the act, even if evidence— no matter how strong—shows the official's actual reason for the act was unconstitutional?" Pet. for Cert. i.

The Court does not explicitly discuss this question at all. Its failure to do so is both puzzling and unfortunate. Puzzling, because immunity is a "threshold" question that must be addressed prior to consideration of the merits of a plaintiff's claim. *Harlow* v. *Fitzgerald,* 457 U. S. 800, 818 (1982). Unfortunate, because in assuming that the answer to the question is "no," the Court establishes a precedent that is in considerable tension with, and significantly undermines, *Harlow.*

I would address the question directly, and conclude, along the lines suggested by Judge Silberman below, that a government official who is a defendant in a motive-based tort suit is entitled to immunity from suit so long as he can offer a legitimate reason for the action that is being challenged, and the plaintiff is unable to establish, by reliance on objective evidence, that the offered reason is actually a pretext. This is the only result that is consistent with *Harlow* and the purposes of the qualified immunity doctrine.

In *Harlow*, respondent A. Ernest Fitzgerald brought a suit claiming that White House aides Bryce Harlow and Alexander Butterfield, acting in concert with President Richard Nixon and others, had conspired to deprive him of his job, deny him reemployment, and besmirch his reputation. *Nixon* v. *Fitzgerald*, 457 U. S. 731, 738–739, n. 18 (1982). Harlow and Butterfield claimed that they were immune from this suit, and we granted certiorari to determine "the immunity available to the senior aides and advisers of the President." *Harlow*, 457 U. S., at 806. We first concluded that unlike the President, senior White House aides were not necessarily entitled to absolute immunity. We next concluded, however, that petitioners were entitled to "application of the qualified immunity standard that would permit the defeat of insubstantial claims without resort to trial." *Id.*, at 813.

In applying that standard in *Harlow* we did not write on a blank slate. The notion that government officials are sometimes immune from suit has been present in our jurisprudence since at least *Osborn* v. *Bank of United States*, 9 Wheat. 738, 865–866 (1824). By the time we took up the question in *Harlow*, we had come to understand qualified immunity as an affirmative defense that had both an "objective" and a "subjective" aspect. See, *e. g.*, *Wood* v. *Strickland*, 420 U. S. 308, 322 (1975).

In *Harlow*, however, we noted that application of the subjective element of the test had often produced results at odds with the doctrine's purpose. First, some courts had considered an official's subjective good faith to be a question of fact "inherently requiring resolution by a jury," making it impossible to accomplish the goal that "insubstantial claims" not proceed to trial. 457 U. S., at 816. Second, we noted that there were "special costs" to inquiries into a government official's subjective good faith. Such inquiries were "broad-ranging," intrusive, and personal, and were thought to be "peculiarly disruptive of effective government." *Id.*, at 817.

Recognizing these problems, we "purged" qualified immunity doctrine of its subjective component and remolded it so that it turned entirely on "objective legal reasonableness," measured by the state of the law at the time of the challenged act. *Mitchell* v. *Forsyth*, 472 U. S. 511, 517 (1985); *Harlow, supra,* at 819. This new rule eliminated the need for the disruptive inquiry into subjective intent, ensured that insubstantial suits would still be subject to dismissal prior to trial, and had the additional benefit of allowing officials to predict when and under what circumstances they would be required to stand trial for actions undertaken in the course of their work. See, *e. g., Davis* v. *Scherer*, 468 U. S. 183, 195 (1984) ("The qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated"). Since then we have held that qualified immunity was to apply "across the board" without regard to the "precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated." *Anderson* v. *Creighton*, 483 U. S. 635, 642–643 (1987).

Applying these principles to the type of motive-based tort suit at issue here, it is obvious that some form of qualified immunity is necessary, and that whether it applies in a given case must turn entirely on *objective* factors. It is not enough to say that because (1) the law in this area is "clearly established," and (2) this type of claim always turns on a defendant official's subjective intent, that (3) qualified immunity is therefore never available. Such logic apparently approves the "protracted and complex," *ante,* at 579, course of litigation in this case, runs afoul of *Harlow*'s concern that insubstantial claims be prevented from going to trial, and ensures that officials will be subject to the "peculiarly disruptive" inquiry into their subjective intent that the *Harlow*

rule was designed to prevent.[1]   Such a rule would also allow plaintiffs to strip defendants of *Harlow*'s protections by a simple act of pleading—any minimally competent attorney (or *pro se* litigant) can convert any adverse decision into a motive-based tort, and thereby subject government officials to some measure of intrusion into their subjective worlds.

Such a result is quite inconsistent with the logic and underlying principles of *Harlow*.[2]   In order to preserve the protections that *Harlow* conferred, it is necessary to construct a qualified immunity test in this context that is also based exclusively on objective factors, and prevents plaintiffs from engaging in "peculiarly disruptive" subjective investigations until after the immunity inquiry has been resolved in their favor.   The test I propose accomplishes this goal. Under this test, when a plaintiff alleges that an official's action was taken with an unconstitutional or otherwise unlawful motive, the defendant will be entitled to immunity and immediate dismissal of the suit if he can offer a lawful reason for his action and the plaintiff cannot establish, through objective evidence, that the offered reason is actually a pretext.

[1] The Court suggests that the *Wood* v. *Strickland* subjective inquiry that we stripped from the qualified immunity analysis in *Harlow* is somehow different from the inquiry into subjective intent involved in resolution of a motive-based tort claim.   *Ante*, at 592.   While the inquiries may differ somewhat in terms of what precisely is being asked, this difference is without relevance for the purposes of qualified immunity doctrine.   Both inquiries allow a plaintiff to probe the official's state of mind, and therefore both types of inquiry have the potential to be "peculiarly disruptive" to effective government.

[2] This result also threatens to "Balkanize" the rule of qualified immunity. *Anderson* v. *Creighton*, 483 U. S. 635, 646, 643 (1987) ("[W]e have been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated.   An immunity that has as many variants as there are modes of official action and types of rights would not give conscientious officials that assurance of protection that it is the object of the doctrine to provide").

The Court's interpretation of *Harlow* does not differ from mine. See *ante*, at 588 ("Under [the *Harlow*] standard, a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense"). The Court does not, however, carry the *Harlow* principles to their logical extension. Its failure to discuss the issue explicitly makes it difficult to understand exactly why it rejects my position, but there appear to be two possibilities.

First, the Court appears concerned that an extension of *Harlow* qualified immunity to motive-based torts will mean that some meritorious claims will go unredressed. *Ante*, at 591 ("Social costs that adequately justified the elimination of the subjective component of an affirmative defense do not necessarily justify serious limitations upon 'the only realistic' remedy for the violation of constitutional guarantees"). This is perhaps true, but it is not a sufficient reason to refuse to apply the doctrine. Every time a privilege is created or an immunity extended, it is understood that some meritorious claims will be dismissed that otherwise would have been heard. Courts and legislatures craft these immunities because it is thought that the societal benefit they confer outweighs whatever cost they create in terms of unremedied meritorious claims. In crafting our qualified immunity doctrine, we have always considered the public policy implications of our decisions. See, *e. g.*, *Wyatt* v. *Cole*, 504 U. S. 158, 167 (1992).

In considering those implications here, it is desirable to reflect on the subspecies of First Amendment claims which we address in this case. Respondent Britton is a District of Columbia corrections officer; petitioner Crawford-El is a District of Columbia prisoner who was transferred from Spokane, Washington, to Marianna, Florida, with intermediate stops along the way. The action of Britton's that gave rise to this lawsuit was asking Crawford-El's brother-in-law to

pick up boxes of the former's belongings for delivery to him, rather than shipping them directly to him in Florida. This act, considered by itself, would seem to be about as far from a violation of the First Amendment as can be conceived. But Crawford-El has alleged that Britton's decision to deliver his belongings to a relative was motivated by a desire to punish him for previous interviews with reporters that he had given, and lawsuits that he had filed. This claim of illicit motive, Crawford-El asserts, transforms a routine act in the course of prison administration into a constitutional tort.

The Court cites *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968), as an example of this sort of tort. *Ante*, at 585, n. 9. But *Pickering* is but a distant cousin to the present case; there the school board plainly stated that its reason for discharging the plaintiff teacher was his writing of a letter to a newspaper criticizing the board. It was not motivation that was disputed, but whether the First Amendment protected the writing of the letter. Closer in point is *Branti* v. *Finkel*, 445 U. S. 507 (1980), also cited by the Court, but there the act complained of was the dismissal of Republican assistants by the newly appointed Democratic public defender. Objective evidence—the discharging of members of one party by the newly appointed supervisor of another party, and their replacement by members of the supervisor's party—would likely have served to defeat a claim of qualified immunity had the defendant official attempted to offer a legitimate reason for firing the Republican assistants. Thus, the defendants in neither *Pickering* nor *Branti* would have been entitled to qualified immunity under the approach that I propose.

Still more distantly related to the facts of the present case are what I would call primary First Amendment cases, where the constitutional claim does not depend on motive at all. Examples of these are *Reno* v. *American Civil Liberties Union*, 521 U. S. 844 (1997) (finding portions of the Communications Decency Act unconstitutional under the First

Amendment); *Barnes* v. *Glen Theatre, Inc.,* 501 U. S. 560 (1991) (concluding that Indiana statute regulating nude dancing did not violate First Amendment); *Brown* v. *Hartlage,* 456 U. S. 45 (1982) (invalidating Kentucky statute that limited the speech of candidates for office); *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976) (invalidating judge's order prohibiting reporting or commentary on murder trial); *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546 (1975) (finding denial of permission to use municipal theater for showing of Hair to be unconstitutional prior restraint); *New York Times Co.* v. *United States,* 403 U. S. 713 (1971) *(per curiam)* (refusing to enjoin publication of contents of classified study).

The great body of our cases involving freedom of speech would, therefore, be unaffected by this approach to qualified immunity. It would apply prototypically to a case such as the present one: A public official is charged with doing a routine act in the normal course of her duties—an act that by itself has absolutely no connection with freedom of speech—but she is charged with having performed that act out of a desire to retaliate against the plaintiff because of his previous exercise of his right to speak freely. In this case, there was surely a legitimate reason for respondent's action, and there is no evidence in the record before us that shows it to be pretextual. Under the Court's view, only a factfinder's ultimate determination of the motive with which she acted will resolve this case. I think the modest extension of *Harlow* which I propose should result in a judgment of qualified immunity for respondent.

Also relevant to a consideration of the costs my proposed rule would incur is that this suit is a request for damages brought under § 1983. If the purpose of § 1983 is to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails," it is hard to see how that purpose is substantially advanced if petition-

er's suit is allowed to proceed. *Wyatt* v. *Cole*, 504 U. S., at 161. Petitioner has already fully exercised his "federally guaranteed rights." Providing compensation to him, even if his claim is meritorious, will foster increased constitutional freedoms only for the hypothetical subsequent individual who, given the imposition of liability in this case, will not be deterred from exercising his First Amendment rights out of fear that respondent would retaliate by misdirecting his belongings.

The costs of the extension of *Harlow* that I propose would therefore be minor. The benefits would be significant, and we have recognized them before. As noted above, inquiries into the subjective state of mind of government officials are "peculiarly disruptive of effective government" and the threat of such inquiries will in some instances cause conscientious officials to shrink from making difficult choices.[3]

The policy arguments thus point strongly in favor of extending immunity in the manner I suggest. The Court's opinion, however, suggests a second reason why this rule might be unnecessary. The Court assumes that district court judges alert to the dangers of allowing these claims

---

[3] This point has perhaps been made most elegantly by Judge Learned Hand, who, in an oft-cited passage, wrote:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others . . . should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. . . . As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949), cert. denied, 339 U. S. 949 (1950).

to proceed can protect defendants by judicious and skillful manipulation of the Federal Rules of Civil Procedure. *Ante,* at 597–601. I have no doubt that, as a general matter, district court judges are entirely capable in this regard. But whether a defendant is entitled to protection against the "peculiarly disruptive" inquiry into subjective intent should not depend on the willingness or ability of a particular district court judge to limit inquiry through creative application of the Federal Rules. The scope of protection should not vary depending on the district in which the plaintiff brings his suit. Cf. *Anderson* v. *Creighton,* 483 U. S., at 643 ("An immunity that has as many variants as there are modes of official action and types of rights would not give conscientious officials that assurance of protection that it is the object of the doctrine to provide"). Indeed, the inconsistency with which some District Courts had applied the *Wood* v. *Strickland* subjective good-faith inquiry was one of the reasons why the *Harlow* Court stripped qualified immunity of its subjective component. *Harlow,* 457 U. S., at 816 ("And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury").

My proposed rule would supply officials with the consistency and predictability that *Harlow* and its progeny have identified as an underlying purpose of qualified immunity doctrine, without eliminating motive-based torts altogether. The Court's solution, which is dependent on the varying approaches of 700-odd district court judges, simply will not; at the end of the day, many cases will still depend on a factfinder's decision as to motivation. No future defendant in respondent's position can know with any certainty that the simple act of delivering a prisoner's belongings in one way rather than another will not result in an extensive investigation of her state of mind at the time she did so. This result is simply not faithful to *Harlow*'s underlying concerns.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

As I have observed earlier, our treatment of qualified immunity under 42 U. S. C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume. See *Burns* v. *Reed*, 500 U. S. 478, 498, n. 1 (1991) (SCALIA, J., concurring in judgment in part and dissenting in part). That is perhaps just as well. The § 1983 that the Court created in 1961 bears scant resemblance to what Congress enacted almost a century earlier. I refer, of course, to the holding of *Monroe* v. *Pape*, 365 U. S. 167 (1961), which converted an 1871 statute covering constitutional violations committed "*under color of* any statute, ordinance, regulation, custom, or usage of any State," Rev. Stat. § 1979, 42 U. S. C. § 1983 (emphasis added), into a statute covering constitutional violations committed *without* the authority of any statute, ordinance, regulation, custom, or usage of any State, and indeed even constitutional violations committed in stark violation of state civil or criminal law. See *Monroe*, 365 U. S., at 183; *id.*, at 224–225 (Frankfurter, J., dissenting). As described in detail by the concurring opinion of Judge Silberman in this case, see 93 F. 3d 813, 829 (CADC 1996), *Monroe* changed a statute that had generated only 21 cases in the first 50 years of its existence into one that pours into the federal courts tens of thousands of suits each year, and engages this Court in a losing struggle to prevent the Constitution from degenerating into a general tort law. (The present suit, involving the constitutional violation of misdirecting a package, is a good enough example.) Applying normal common-law rules to the statute that *Monroe* created would carry us further and further from what any sane Congress could have enacted.

We find ourselves engaged, therefore, in the essentially legislative activity of crafting a sensible scheme of qualified

immunities for the statute we have invented—rather than applying the common law embodied in the statute that Congress wrote. My preference is, in undiluted form, the approach suggested by Judge Silberman's concurring opinion in the Court of Appeals: extending the "objective reasonableness" test of *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), to qualified immunity insofar as it relates to intent-based constitutional torts.

THE CHIEF JUSTICE's opinion sets forth a test that is "along the lines suggested by Judge Silberman," *ante*, at 602, but that differs in a significant respect: It would allow the introduction of "objective evidence" that the constitutionally valid reason offered for the complained-of action "is actually a pretext." *Ibid.* This would consist, presumably, of objective evidence regarding the state official's *subjective intent*—for example, remarks showing that he had a partisan-political animus against the plaintiff. The admission of such evidence produces a less subjective-free immunity than the one established by *Harlow.* Under that case, once the trial court finds that the constitutional right was not well established, it will not admit any "objective evidence" that the defendant *knew* he was violating the Constitution. The test I favor would apply a similar rule here: once the trial court finds that the asserted grounds for the official action were objectively valid (*e. g.*, the person fired for alleged incompetence was indeed incompetent), it would not admit any proof that something other than those reasonable grounds was the genuine motive (*e. g.*, the incompetent person fired was a Republican). This is of course a more severe restriction upon "intent-based" constitutional torts; I am less put off by that consequence than some may be, since I believe that *no* "intent-based" constitutional tort would have been actionable under the § 1983 that Congress enacted.