**Oscar W. EGERVARY,**

v.

**Virginia YOUNG, et al.**

**No. CIV. A. 96–3039.**

United States District Court,
E.D. Pennsylvania.

May 22, 2001.

---

Gary L. Azorsky, Schnader, Harrison, Segal & Lewis, L.L.P., Philadelphia, PA, for Plaintiff.

Richard Mentzinger, Jr., Keir N. Dougall, James G. Sheehan, Office of the U.S. Attorney, Philadelphia, PA, for Virginia Young, James Schuler, and John Does One-Ten.

Richard A. Kraemer, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Frederick P. Rooney and James J. Burke.

Deborah R. Popky, Robert S. Tintner, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, Frederick C. Horn, Fox, Rothschild, O'Brien & Frankel, LLP, Lansdale, PA, for Jeffrey C. Nallin.

## *MEMORANDUM*

O'NEILL, District Judge.

The federal defendants' motion for a protective order requests that I decide whether the scheduled deposition of a third-party witness should go forward after newly-named federal defendants have claimed qualified immunity. For the reasons stated below, the motion will be denied.

### I.

This case derives from an international child custody dispute.[1] In February 1993, Ms. Aniko Kovacs, plaintiff's wife, took their son Oscar to Hungary, ostensibly to perform in a concert. Plaintiff alleges that sometime thereafter his wife informed him that she was ending their marriage and would remain in Hungary with Oscar. Plaintiff made a number of attempts to reconcile with his wife and/or convince her to allow Oscar to return to this country. She refused and eventually hid Oscar from his father in Hungary. Plaintiff went to Hungary to attempt to retrieve his son and allegedly was told by the U.S. Embassy in Budapest that he was free to take Oscar (who was a U.S. citizen and had spent his entire life in this country) back to the U.S. if the child could be located. On December 18, 1993, plaintiff found his wife and son leaving her parents' apartment in Budapest. He retrieved the child and they returned to the United States.

On May 13, 1994, members of the Pennsylvania State Police and the U.S. Marshals arrived at Mr. Egervary's home with an order that had been signed by the Honorable William J. Nealon of the U.S. District Court for the Middle District of Pennsylvania. Pursuant to the order, the law enforcement officials removed Oscar from plaintiff's custody and delivered him to defendant Frederick P. Rooney, Esq., Ms. Kovacs' attorney. Defendant Rooney then immediately returned the child to his mother in Hungary.

Plaintiff subsequently learned that his wife had, with the assistance of State Department officials and private attorneys, filed a petition under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq. That petition was presented to Judge Nealon in an *ex parte* hearing of which plaintiff was afforded no notice and in which he had no opportunity to be heard.

Plaintiff filed his first complaint in this action in this District on April 17, 1996. The complaint alleged that plaintiff's due process rights had been violated and named Virginia Young and James Schuler of the State Department (the "federal defendants") as well Frederick P. Rooney, Esq., James J. Burke, Esq., and Jeffrey C. Nallin, Esq. (the "attorney defendants") who had represented Ms. Kovacs in the ICARA hearing before Judge Nealon.

The case was originally assigned to the Honorable E. Mac Troutman. On January 7, 1997, Judge Troutman concluded that venue was improper in this District and transferred it to the Middle District where it was assigned to Judge Nealon.[2] Subse-

---

1. The underlying facts were discussed at greater length in two previous decisions. *See Egervary v. Rooney,* 80 F.Supp.2d 491 (E.D.Pa.2000) (*"Egervary I "*); *Egervary v.*

*Rooney,* No. 96–3039, 2000 WL 1160720 (E.D.Pa. Aug.15, 2000) (*"Egervary II "*).

2. Judge Troutman concluded that the presence of the federal defendants made venue in

quently, Judge Nealon recused himself. Thereafter, all of the other judges in the Middle District also recused themselves, and the Honorable Sue L. Robinson of the U.S. District Court for the District of Delaware was designated to preside over the case in the Middle District.

On August 17, 1998, Judge Robinson dismissed the federal defendants from the case, concluding that plaintiff had failed to allege adequately that the proceedings before Judge Nealon were "in anyway directed by, approved of, or even within the knowledge of the [federal defendants]." Thereafter, upon unopposed motion by plaintiff Judge Robinson transferred the case back to the Eastern District pursuant to 28 U.S.C. § 1404, and it was reassigned to me.

In *Egervary I,* I denied the attorney defendants' motion for summary judgment because I concluded that plaintiff's due process rights had been violated when he was afforded no notice of or opportunity to be heard in the ICARA proceedings.[3] *See Egervary I,* 80 F.Supp.2d at 497–504. At that time, I ordered the attorney defendants to submit briefs on why summary judgment should not be entered against them on the issue of liability. *Id.* at 509–10. After consideration of those briefs, in *Egervary II* I concluded that defendant Nallin could not be held liable as a federal actor and therefore entered summary judgment in his favor. *See Egervary II,* 2000 WL 1160720, at *6. I also concluded that defendants Rooney and Burke could assert a good faith defense at trial and therefore declined to enter summary judgment against them. *Id.*

As discovery proceeded against defendants Rooney and Burke, plaintiff uncovered evidence that arguably shows that the federal defendants had personal involvement in the deprivation of plaintiff's due process rights. For this reason, on March 6, 2001 I granted plaintiff leave to amend his complaint to re-assert claims against the federal defendants. On May 11, 2001, the federal defendants filed a motion to dismiss the amended complaint arguing, *inter alia,* that plaintiff's claims are barred by the doctrine of qualified immunity.

On Monday, May 14, 2001, I conducted a telephone conference with counsel, who informed me that the deposition of Judge Nealon is scheduled to take place later this month. Counsel for the federal defendants objected to the deposition going forward because they have asserted qualified immunity. Because the federal defendants' motion to dismiss was recently filed, plaintiff has not yet responded to it and it is unlikely the motion will be decided before Judge Nealon's deposition is to take place. I therefore asked the federal defendants to provide a letter brief in support of their oral motion for a protective order. I received that brief on Thursday, May 17, 2001.

## II.

Because it affects my analysis of the issues involved in the federal defendants' motion, I will describe my understanding of why Judge Nealon's deposition is being taken and some of the issues that the deposition may touch upon.

One of plaintiff's claims in this case is that the attorney defendants, acting in concert with the federal defendants, made

---

this district improper under 28 U.S.C. § 1391(b). *See Egervary v. Young,* No. 96–3039, 1997 WL 9787, at *5 (E.D.Pa. Jan.7, 1997).

**3.** Specifically, I concluded that plaintiff was entitled either to prior notice of the ICARA proceedings or to a prompt, state-initiated postdeprivation hearing after Oscar had been taken from his custody. *Id.* at 501–02.

misleading representations to Judge Neal-
on during the *ex parte* ICARA hearing.
The basis for this claim appears in an
affidavit by plaintiff's counsel that was
submitted as part of the record in *Eger-
vary I:*

> At a case management conference in
> this action before The Honorable Wil-
> liam J. Nealon, Jr. on December 11,
> 1997, defendants' counsel presented
> Judge Nealon with [their clients rendi-
> tion of the facts surrounding the *ex
> parte* hearing]. Judge Nealon advised
> counsel that his recollection significantly
> differed from defendants' stated posi-
> tion. His Honor stated that it was not
> true that defendants presented him with
> several options from which to choose,
> and that he decided upon one option
> following careful review and consider-
> ation of all options. His Honor advised
> that it was his recollection that Mr. Roo-
> ney stated that he represented the State
> Department, that no notice to Mr. Eger-
> vary was required, that the State De-
> partment "does this all the time," and
> that all arrangements had been made to
> take plaintiff's son to Hungary that af-
> ternoon as soon as His Honor signs the
> order permitting them to move forward.

*Id.* at 496 n. 3 (quoting the Affidavit of
Gary L. Azorsky, Esq.). At some time
thereafter, Judge Nealon apparently real-
ized that he could be a witness in this case
and recused himself. *Id.*

In addition, during his deposition defen-
dant Rooney testified that the federal de-
fendants had both direct and indirect con-
tact with Judge Nealon's chambers on the
day of the *ex parte* hearing:

> Q: In your Answers to Interrogatories
> I believe you said, and I don't have
> them in front of me but I will get
> them if there's a question about
> this, I believe that you said that the
> State Department had contacted the
> court to arrange for you to appear
> before Judge Nealon.

> A: I don't know if they called to ar-
> range. They called to inform the
> court that a petition would be pre-
> sented involving a Hague matter. I
> don't know who called, I don't know
> with whom they spoke; I just knew
> that by the time we got there that
> the judge was aware or the judge's
> chambers was aware of someone
> coming in with a petition. I also
> think that we may have called,
> someone from my office may have
> called, to advise the judge that we
> were on our way to Scranton.

> . . .

> Q: Did you speak to [defendant Shuler]
> about [the petition presented to
> Judge Nealon] before it was pre-
> sented to the court or after?

> A: In between.

> Q: Meaning what?

> A: I went in and I saw Judge Nealon.
> I spoke to him about the situation,
> presented him with the petitions
> and the order, and to the best of my
> recollection he then had a status
> conference or had to do something,
> and so he adjourned our meeting. I
> waited and during that time I spoke
> to Jim Shuler because the judge
> was specifically concerned about
> whether or not he had the authority
> to allow the child to be returned.
> While it was my impression that he
> did, in order to assure the judge
> that, in fact, my interpretation of
> his authority was correct, I called
> Shuler from the judge's chambers
> and I said, Jim, Judge Nealon ap-
> pears to be willing to sign an order
> for the child to be returned, but he
> wants to just be sure that that's

within his authority and Shuler said to me he's the judge. He's got the authority to make whatever decision he wants.

*See* Rooney Dep. at 114–16 and 120–21.[4]

 On this basis, I conclude that Judge Nealon's testimony could be relevant to plaintiff's case against the attorney defendants (i.e., the question of good faith) and also to the issue of qualified immunity raised in the federal defendants' motion to dismiss. Specifically, in their motion, the federal defendants have argued that: "Plaintiff's claim against the Federal Defendants boils down to the contention that they offered legal advice that prompted the plaintiff's former wife, a litigant in court proceedings, to seek and obtain relief from Judge Nealon that violated plaintiff's due process rights under the Fifth Amendment." *See* Federal Defendants' Br. (May 11, 2001) at 25. However, based on the affidavit and testimony quoted above, it could be argued that the federal defendants did more than merely offer legal advice. Therefore, to the extent that Judge Nealon testifies about the conduct of the federal defendants, his deposition could be relevant to the qualified immunity issue.[5]

## III.

Initially, I note that it is unclear what relief the federal defendants are seeking.

Plaintiff has not noticed a deposition of the federal defendants. Nor has plaintiff sought any other form of discovery from them. Rather, plaintiff seeks to conduct the deposition of a third-party witness who is likely to have relevant testimony whether or not the federal defendants remain in this case.

 The federal defendants have stated that they "have a right not to be involved in discovery" at this time. *See* Federal Defendants' Br. (May 17, 2001) at 1. I agree that I have no power to compel any defendant to appear at the deposition of third-party witness, anymore than I have the power to compel a defendant to answer a complaint, oppose a motion, or appear at trial so as to avoid a default judgment.

 The federal defendants also state, however, that they are "entitled to protection from any discovery" so that "any discovery taken by other parties in the case may not be used against them." *Id.* at 4. This assertion raises two possibilities.

First, conceivably I could order that: 1) any testimony provided by Judge Nealon will not be admissible against the federal defendants; and 2) Judge Nealon will be required to give an additional deposition after the qualified immunity issue has been resolved, if necessary. I reject this option. I do not think I should rule on the admissibility of testimony that has not yet been given. In addition, I question whether I

---

4. Plaintiff also has stated that Rooney testified to the following: "After Judge Nealon signed the order, defendant Rooney called a lawyer in his office and asked the lawyer to call defendants Young and Schuler to make arrangements to remove the child from the United States without a passport ... Defendants Young and/or Schuler and perhaps other officials at the State Department arranged for a waiver of the child's passport and directly contacted the airline to authorize the removal of the child from the United States in that fashion." *See* Plaintiff's Br. (Feb. 21,

2001) at 6. This portion of Rooney's deposition was not attached to plaintiff's brief.

5. The federal defendants have argued that qualified immunity is a "purely legal question." *See* Federal Defendants' Br. (May 17, 2001) at 3. I agree that once the conduct at issue is established, the question of whether that conduct violates a clearly established legal right is a legal question. However, the question whether the federal defendants have properly characterized the conduct at issue is a factual inquiry.

have the power to compel Judge Nealon to testify about events that occurred in his chambers during official proceedings.[6]

Second, I could order that the deposition be continued until after the qualified immunity issue is resolved, an option I will now consider.

## IV.

Neither the federal defendants' brief nor my independent research has yielded a case that is directly on point.

The cases that come closest are *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and its progeny. In *Harlow,* the Court held that qualified immunity shields government officials from suit for actions taken within the scope of their employment unless they have violated "clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. 2727. The Court further stated that subjecting public officials to suit entails significant "social costs" including "the expense of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.* at 814, 102 S.Ct. 2727. The Court therefore found that qualified immunity should protect public officials from both "the costs of trial" and "the burdens of broad-reaching discovery." *Id.* at 817–18, 102 S.Ct. 2727. The Court reaffirmed this principle in later cases. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (suits against government officials involve "substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.").

In order to minimize these "social costs," the Court has expressed a preference for resolving the issue of qualified immunity before discovery. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *Mitchell v. Forsyth,* 472 U.S. 511, 526–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Anderson,* 483 U.S. at 646 n. 6, 107 S.Ct. 3034; *Siegert v. Gilley,* 500 U.S. 226, 232–33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). However, in its most recent decision addressing the issue, the Court stated, in a passage not referred to by the federal defendants, that this is not an absolute right:

> Discovery involving public officials is indeed one of the evils that *Harlow* aimed to address, but neither that opinion nor subsequent decisions create an immunity from *all* discovery. *Harlow* sought to protect officials from the costs of "broad-reaching" discovery, 457 U.S., at 818, 102 S.Ct. 2727, and we have since recognized that limited discovery may sometimes be necessary before the district court can resolve a motion for summary judgment based on qualified immunity.

*Crawford–El v. Britton,* 523 U.S. 574, 593 n. 14, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (emphasis in original).

Therefore, even if the *Harlow* line of cases were dispositive of this issue (and I conclude that they are not), Judge Nealon's deposition may proceed to the extent that his testimony is relevant to the qualified immunity inquiry.

## V.

■ I conclude that Judge Nealon's deposition should proceed as scheduled for the following reasons:

■ First, I find it significant that, unlike the *Harlow* line of cases, the federal

---

6. I am informed that Judge Nealon has agreed to give his deposition and that counsel have scheduled it to suit Judge Nealon's availability.

defendants are not seeking to stop discovery against themselves but rather are seeking to postpone the deposition of a third party. Qualified immunity, as described in *Harlow* and its progeny, is a shield against "broad-reaching" discovery. *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. In this case, however, the federal defendants are attempting to use it to stop a deposition that will be relevant to plaintiff's claims regardless of how the qualified immunity issue is decided. Moreover, the federal defendants state that they will take an interlocutory appeal if the motion to dismiss is denied. *See* Federal Defendants' Br. (Mar. 20, 2001) at 8–9 ("Thus, if the Federal Defendants' motion to dismiss on the ground of qualified immunity is denied, they would expect to file an immediate, interlocutory appeal with the Third Circuit."). If such an appeal were taken, Judge Nealon's deposition would not take place (and probably no trial against the attorney defendants would proceed) [7] until after the Court of Appeals resolved the immunity issue.

Second, the federal defendants' reliance on Supreme Court precedent that says that qualified immunity should be decided "at the earliest possible stage of a litigation" (*Anderson*, 483 U.S. at 646 n. 6, 107 S.Ct. 3034) is not persuasive since they themselves are responsible for the delay in reaching the issue. Judge Robinson dismissed the federal defendants from the case because she accepted their argument that the proceedings before Judge Nealon were not "in anyway directed by, approved of, or even within the knowledge of the [federal defendants]." *See* Order dated August 17, 1998. Defendant Rooney has since testified that the federal defendants had personal involvement in those events,

and in their pending motion to dismiss the federal defendants have abandoned their claim that they had no personal involvement. It is therefore fair to infer that the federal defendants asked Judge Robinson to dismiss them from the case for lack of personal involvement when they in fact knew that they had been personally involved. If they had not asserted that defense, Judge Robinson likely would have ruled on the qualified immunity issue three years ago. If there has been a delay in consideration of the qualified immunity issue, the federal defendants are the cause.

Third, the burden of allowing a single deposition to go forward is slight. As the Supreme Court has emphasized, qualified immunity protects government officials from the costs of "broad-reaching" discovery. *See Harlow*, 457 U.S. at 818, 102 S.Ct. 2727; *Crawford–El*, 523 U.S. at 593 n. 14, 118 S.Ct. 1584. Since even a strict application of *Harlow* and its progeny would allow the deposition to go forward to the extent it relates to the question of qualified immunity, the true measure of the burden on the federal defendants is that of attending a deposition on all issues versus attending a deposition limited to the issue of qualified immunity. In either case, the burden is slight.

Finally, my consideration of this issue cannot ignore the fact that the deponent is a federal judge. As the federal defendants have been quick to point out, the doctrine of qualified immunity is premised on the "social costs" of subjecting government officials to suit. *See Harlow*, 457 U.S. at 814, 102 S.Ct. 2727. But there is also a social cost to asking a federal judge to appear for two depositions. Judge Nealon has agreed to appear for his deposition at

---

7. In that event, I think it unlikely that I would require or permit plaintiff to proceed to trial against the attorney defendants only.

this time, and I will allow the deposition to go forward.