**Daniel J. MARTIN, Plaintiff–Appellant,**

v.

**Sarah BROWN–CLARK,
Defendant–Appellee.**

No. 01–4275.

United States Court of Appeals,
Sixth Circuit.

Sept. 25, 2003.

Diane M. Gonda, Cleveland, OH, for Plaintiff–Appellant.

Mark D. Katz, Mark E. Porter, Ulmer & Berne, Cleveland, OH, for Defendant–Appellee.

Before CLAY and GIBBONS, Circuit Judges, and CLELAND, District Judge.*

GIBBONS, Circuit Judge.

Plaintiff-appellant Daniel J. Martin brought suit under 42 U.S.C. § 1983 against the Clerk of the Youngstown Municipal Court, Sarah Brown–Clark, after she terminated him from his position as a deputy clerk. He alleges that, in violation of his First and Fourteenth Amendment rights, Brown–Clark terminated him for his political activities (namely, supporting Brown–Clark's opponents in the primary and general elections) and for his union activities. The district court granted sum-mary judgment in favor of Brown–Clark on both claims. For the following reasons, we affirm the grant of summary judgment.

I.

Brown–Clark won election in November 1999 as the Clerk of the Youngstown Municipal Court. Martin had been employed in the Clerk's office as a deputy clerk with bookkeeping responsibilities since 1990, when he was hired by the former Clerk, Rosemary Durkin. In 1999, Rosemary Durkin retired and Richard Durkin ran for the office of Clerk, losing to Brown–Clark in the Democratic primary.

Martin managed Richard Durkin's unsuccessful primary campaign. All other members of the Clerk's staff also supported Durkin in the primary. Martin later supported Brown–Clark's opponent in the general election, Joe Rafidi. After Brown–Clark took office, she retained nineteen employees and declined to retain four employees, including Martin. An Ohio statute provides that "[a] deputy or clerk, appointed in pursuance of law, holds the appointment only during the pleasure of the officer appointing him." Ohio Rev. Code § 3.06(A).

After Brown–Clark's election and before she took office, Martin and other deputy clerks sought to achieve job security by attempting to organize a labor union. Martin attempted to have the Electrical Workers Union (UEW) serve as the collective bargaining representative for the office, and he approached his co-workers with a petition demonstrating interest. Twenty-two of the twenty-three employees signed the petition. Lucille Moreland–Smith and Elsa Russo, two of those employees who signed the UEW petition, also

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

sought representation by the American Federation of State, County, and Municipal Employees, AFL–CIO (AFSCME). Brown–Clark was aware of both union organizing efforts. Martin organized a meeting with a UEW representative, which occurred on November 18, 1999. Brown–Clark did not attend that meeting. According to her deposition, she received reports from other employees about the events of the meeting, but only "some weeks later," after Martin had been terminated. Moreland–Smith and Russo organized a separate meeting in support of AFSCME, which occurred on November 22, 1999. Brown–Clark attended the AFSCME meeting; Martin did not.

According to Martin's affidavit, at the November 22 meeting, Brown–Clark stated that she would not fire anyone and that therefore a union was unnecessary. Martin's affidavit states:

2. I attended a meeting of the employees of the Clerk's office in November, 1999. A major topic of the meeting was whether the employees of the Clerk's office should unionize. I was a vocal proponent of a union. I stated that my understanding of the law that we, as employees, held our jobs at the pleasure of the Clerk and could be fired. I argued that a union could provide protection for the employees of the Clerk's office. . . .

5. As stated above, I was a vocal advocate for a union. I circulated petitions on behalf of AFSCME. Brown–Clark was advised of my union activities by my colleagues at the Clerk's Office. Brown–Clark appeared at the November, 1999, meeting at which the union was discussed. At that time Brown–Clark stated that she would not fire anyone therefore a union was not neces-

sary. Within a week of that meeting Brown–Clark fired me.

The district court found that this affidavit was misleading, because it implied that Martin was present at the AFSCME meeting and that he had personally heard Brown–Clark say that a union was unnecessary. Martin admitted at his deposition that he was not at the meeting.

The morning after the November 22 AFSCME meeting, Martin asked several of his co-workers what had transpired at the meeting. At his deposition, he stated:

Well, a major concern of mine was that Ms. Brown–Clark had walked through the meeting and said to the employees that were there, one statement I got from two, at least three different people who I talked to was, she says, I'm not lowering wages and I'm not firing anybody. There's no need for a union.

And then that wasn't a big, big—I mean, it was kind of a concern of mine, but I—my big concern was then the following day, I believe they were even postmarked that Monday night or it could have been the next morning, I got a letter of termination. All my union support all got letters of being kept. I just thought the time frame was very strange to me.

By letter dated November 24, 1999, Clerk–Elect Brown–Clark informed Martin that his services as a deputy clerk would no longer be required after the expiration of Rosemary Durkin's term as clerk. Other union supporters, including Moreland–Smith and Russo, were retained. Overall, Brown–Clark terminated four employees, including Martin, and retained nineteen employees. After the retention letters were received, the employees' efforts to unionize ceased. Martin and Brown–Clark did not discuss the reasons

for his termination,[1] and the termination letter did not state a reason. Martin said at his deposition, "I'm not sure why she fired me."

According to Brown–Clark's deposition, she had been informed by other members of the office that Martin was hostile to her. She stated that she had heard "rumors from the time that [she] won the primary election" that certain people in the clerk's office were strongly opposed to her being elected, including Martin and Steve Darnavan, another employee with bookkeeping responsibilities. She stated:

I know that there was a number of the people who retired said that they would not work for me because I'm an African–American, and some of the comments that came out of the bookkeeping office from Steve Darnavan and Danny Martin were less politically correct as it relates to my ethnicity and their determination that they would not work for someone like me.

So of the four retirees, and they may have had the time to retire, but the rumors that they heard about me—all incorrect, I might add—motivated them to leave the office. And I am given to understand that Dan Martin made it clear to all of the employees that it would be a good idea for them to quit and leave me with no experienced employees.

Brown–Clark testified that she had heard rumors that Martin made the following statements: (1) he told his co-workers he would not work with her if she was elected, (2) he encouraged his co-workers to resign if Brown–Clark was elected, and (3) he made predictions as to what would occur if she took office, stating that the deputy clerks would be terminated and Brown–

Clark would appoint "her new people" to the deputy clerk positions. Brown–Clark personally had not heard Martin make any of these statements, but she stated that the comments were "affirmed by seven definite people who were clerks at the time." She stated that "the bookkeeping office is a very critical office in the Clerk of Court operation, and it would not have been in the best interest of my office to allow two people who were very hostile to me to work in that capacity." She also stated that she was unaware whether Martin served in a supervisory role, and stated, "I have seen no job description. I don't know what Mr. Martin did." She did not speak to Martin about whether the rumors were true or not. She stated "affirmation of the rumors by seven people . . . was significant enough information for me to feel as though retaining Dan Martin would have been a very bad move on my part and would have jeopardized the operations of my office and the success of my tenure."

Brown–Clark, in her answers to interrogatories, stated that Elsa Russo, also employed in bookkeeping, reported to Brown–Clark that Martin had used racist language to refer to Brown–Clark, stated that he would not work for her, and stated, "I want to see her fail." Also according to her answers to interrogatories, Brown–Clark was told by Bonita Zerbonia, a clerk's office employee whose desk was near the bookkeeping office, that Martin said, "Sarah [Brown–Clark] is really bad news. She will get rid of everyone in this room," and, "We should all quit, then what will she do?"

Martin filed suit under 42 U.S.C. § 1983 on May 2, 2000. He claimed that his

---

**1.** Although this action was technically a failure to retain Martin rather than a termination, we refer to it as a "termination" for the sake of simplicity and consistency with the district court's usage.

termination was (1) an unlawful dismissal based on political patronage in violation of the First and Fourteenth Amendments to the Constitution, and (2) a violation of his First Amendment right to free association in that the termination was in retaliation for his union organizing activities.

Brown–Clark filed a motion for summary judgment on the basis of qualified immunity on October 19, 2000. On February 20, 2001, the district court granted this motion with respect to the political patronage claim. It stated that "a genuine issue of material fact exists with respect to Defendant's motivation for terminating Plaintiff's employment." However, it held that even if Brown–Clark had terminated Martin because of his political patronage, she was entitled to qualified immunity because the right to be free of such a termination was not so clearly established that a reasonable official in Brown–Clark's position would have known she was violating it. In the same order, the district court determined that a question of material fact existed as to the union activity claim and denied summary judgment as to that claim.

After the depositions of both parties were taken, Brown–Clark filed a second motion for summary judgment on August 10, 2001. In this motion, she argued that (1) Martin had failed to provide evidence that his purported union activities involved a matter of public concern such that they merited constitutional protection, and (2) Martin had failed to produce evidence to overcome Brown–Clark's stated reasons for terminating him. The district court found that Martin had previously misled the court about certain facts surrounding his union activity and ordered additional briefing. The district court stated that Martin's affidavit was misleading

> with respect to the existence of a second union movement, as well as the temporal

proximity of the UEW meeting to his termination. Moreover, it is now clear that Plaintiff had no personal knowledge of Defendant's alleged statements at the AFSCME meeting, and therefore, his statement should not have been considered by the court in its determination of the motion for summary judgment on the issue of qualified immunity.

On November 5, 2001, the district court granted summary judgment in favor of Brown–Clark on the union activity claim. This appeal followed, challenging the district court's award of summary judgment in favor of defendant on both the political patronage and union activity claims.

## II.

This court reviews a district court's order granting summary judgment *de novo*. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir.2000). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, we view the evidence and any inferences that may be drawn therefrom in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment "serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford–El*

*v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). In a constitutional motive-based tort claim, "if the defendant-official has made a properly supported motion, the plaintiff may not respond simply with general attacks on the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford–El,* 523 U.S. at 600, 118 S.Ct. 1584 (citing *Liberty Lobby,* 477 U.S. at 256–57, 106 S.Ct. 2505). "As long as plaintiffs produced evidence that could support a finding that [defendant] discharged them on the basis of their [protected activity], the district court [is] obligated under *Crawford–El* to deny [the defendant's] motion for summary judgment." *Hoard v. Sizemore,* 198 F.3d 205, 219 (6th Cir.1999). We may affirm summary judgment on any grounds supported by the record, even if the district court relied upon different grounds. *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.,* 323 F.3d 396, 403–04 (6th Cir.2003).

To establish a claim that his termination was retaliation for his allegedly protected political and union activities, Martin must provide evidence that (1) he engaged in protected conduct, (2) an adverse employment action was taken against him, (3) the protected conduct played a substantial part in the decision to take the adverse employment action, and (4) the employer would not have taken the adverse action if not for the protected conduct. *See Mt. Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999) (*en banc*). Martin arguably satisfies the first element (although defendant argues that his union activity did not "touch on a matter of public concern," such that it is not protected conduct) and clearly satisfies the second element, an adverse employment action. However, he fails to provide evidence to satisfy the third element as to either of his claims.

Martin failed to raise a genuine issue of material fact with respect to Brown–Clark's motivation for terminating him. That is, he has failed to provide evidence from which a reasonable jury could infer that his termination was motivated by either his political activities or his union activities. The uncontradicted evidence shows that Brown–Clark terminated Martin because she believed that he had expressed animosity toward her, that he had stated that he would not work with her and that he wanted to see her fail, and that he was encouraging all the other employees of the Clerk's office to resign. As the Supreme Court has stated, "employees may always be discharged for good cause, such as insubordination or poor performance when those bases in fact exist." *Elrod v. Burns,* 427 U.S. 347, 366, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). This is such a case. Martin has not produced any evidence that his termination was the result of his political activities or his union organization attempts, rather than Brown–Clark's belief that he was hostile toward her. Therefore, we affirm the district court's rulings.

■ Initially, we consider the union activity claim. Martin's statements that Brown–Clark discouraged employees from unionizing by stating that a union was unnecessary were hearsay and were properly excluded by the district court. Martin does not challenge this ruling on appeal. Yet Martin contends that a genuine issue of material fact exists even without the hearsay evidence, and he relies entirely on Brown–Clark's deposition. He argues that the following evidence satisfies his burden. First, Brown–Clark was aware of Martin's union activities before terminating him. Second, the two employ-

ees who told Brown–Clark about Martin's union activities were troubled by Martin's efforts on behalf of the UEW, causing Brown–Clark to be concerned about an inappropriate union "being rammed down their throats." Third, all efforts to obtain UEW as the union representative ceased after Martin's termination. Fourth, the two employees who sought to have AFSCME as the representative continued in their efforts after Martin's termination. Martin's theory of the case is that Brown–Clark terminated him because he was the driving force behind a union she viewed as "inappropriate" for the employees.

The evidence, however, establishes only that Martin participated in union activities, that *other employees* were concerned about it, that Brown–Clark was aware of it, and that Brown–Clark terminated Martin before taking office. It fails to establish that Brown–Clark herself was concerned that AFSCME was inappropriate:

Q: Did [Zerbonia, Moreland–Smith, and Russo] indicate to you why they came to tell you about the union activities?

A: Yes. They were concerned that an inappropriate union was going to be rammed down their throats. There was some feeling among some of those who retired, as well as some of those who were retained, that they needed to commit to this union.

Brown–Clark also stated that her position regarding unionization was that it was "up to the employees" and "not for me as the administrator to decide that."

At Martin's deposition, the following exchange occurred:

Q: Was it the timing between when you did your union organizing activity and your termination that leads you to believe that one resulted from the other?

A: Yes.

Q: Okay. Anything besides the timing?

A: No.

Mere closeness in time of protected activity and termination, without more, does not raise a genuine issue of material fact. *Nguyen*, 229 F.3d at 566 ("temporal proximity in the absence of other evidence of causation is not sufficient to raise an inference of a causal link" between protected activity and adverse action). Thus, Martin's evidence that his termination was close in time to his union activity would by itself be insufficient to support his claim.

Although the fact that Brown–Clark knew of his union activity before terminating him supports his claim, this fact fails to raise a genuine issue for several reasons. First, other employees who took affirmative steps toward unionization, Moreland–Smith and Russo, were not subject to adverse employment actions. Second, other employees who signed the UEW petition circulated by Martin were not terminated. Third, Martin has failed to present any circumstantial evidence that Brown–Clark had any anti-union, or anti-AFSCME, animus. Martin cites only Brown–Clark's deposition, which shows that Brown–Clark herself was a member of labor unions and was endorsed by labor unions in the general election. Fourth, under Ohio law, employees of the Clerk's office may unionize only if the Clerk has given her express permission. *See* Ohio Rev.Code §§ 4117.01(C)(8) and 4117.03(C); *State ex rel. Ohio Council 8, AFSCME v. Spellacy*, 17 Ohio St.3d 112, 478 N.E.2d 229, 231–32 (1985) (noting that Ohio's Public Employees Collective Bargaining Act extended collective bargaining rights to public employees, but excluded employees of the courts unless their employer expressly elected to engage in collective bargaining). Thus, Brown–Clark could have prevented

the formation of a union without terminating Martin.

Moreover, Martin has failed to present any evidence that Brown–Clark's stated reasons for terminating him were pretextual. According to Brown–Clark, she had been informed by numerous sources that Martin was taking steps to sabotage her administration by, among other things, encouraging all the employees of the Clerk's office to resign. She stated that, after seven people had confirmed that Martin was hostile to her, she felt that "retaining Dan Martin would have been a very bad move on my part and would have jeopardized the operations of my office and the success of my tenure." Martin has not controverted this evidence. Therefore, he has failed to raise a genuine issue that his union activities were a substantial factor in his termination.

■ Second, in alleging that he was terminated for his political activities, Martin offers evidence to show that he supported her political opponents in the primary and general elections, that Brown–Clark was aware of his support of them, and that he was terminated after she was elected. Again, however, he fails to provide evidence of any causal link. In fact, the evidence shows that every employee in the Clerk's office supported Brown–Clark's primary election opponent, Richard Durkin. However, Brown–Clark retained nineteen of those employees. Furthermore, as discussed above, she testified that she had valid reasons for terminating Martin. Specifically, she testified that she believed that Martin was very hostile to her and wanted her to fail. Further, according to her testimony, she believed that Martin had made racist remarks about her and encouraged other employees to resign. She stated that seven employees of the Clerk's office had confirmed that Martin was hostile to her. Martin offered no

evidence that this stated reason was a pretext.

Because we decide that Martin failed to raise a genuine issue of material fact with respect to his retaliation claims, it is unnecessary to decide whether Martin's claims would have stated a constitutional violation if supported by evidence. It is also unnecessary for us to decide whether Brown–Clark would have been entitled to qualified immunity.

In sum, Martin failed to meet his burden to withstand Brown–Clark's motion for summary judgment on both his political patronage claim and his union activity claim. We therefore affirm the district court's decision.