PAUL G. BYRON, UNITED STATES DISTRICT JUDGE
This cause comes before the Court on the following:
1. Plaintiffs' Motion for Reconsideration of the Court's Order on Defendant's Motion to Dismiss (Doc. 110), filed April 17, 2017;
2. Defendant's Response in Opposition to Plaintiffs' Motion for Reconsideration (Doc. 114); filed May 1, 2017;
3. Defendant's Motion for Summary Judgment (Doc. 115), filed May 1, 2017;
4. Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc, 133), filed May 19, 2017; and
5. Defendant's Reply in support of Motion for Summary Judgment (Doc. 137), filed June 2, 2017.
The parties have completed their briefing and the Court is otherwise fully advised on the premises. Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and the parties' respective legal memoranda, the Court will grant in part and deny in part Plaintiffs' Motion for *1307 Reconsideration, and grant in part and deny in part Defendant's Motion for Summary Judgment.
I. BACKGROUND
A. Introduction
Plaintiffs sue Defendant, American General Life Insurance Company ("American General"), for failing to disclose crucial information to Plaintiffs when they invested in Voluntary Employee Beneficiary Association ("VEBA") programs that included life insurance policies issued by American General. (Doc. 54, ¶ 2). The particular VEBA programs that Plaintiffs invested in have been found to be tax avoidance schemes, and have thus subjected Plaintiffs to penalties issued by the Internal Revenue Service ("IRS"). Plaintiffs claim that American General knew that the VEBA programs at issue in this case did not comply with federal law, and yet failed to disclose that information to Plaintiffs. Moreover, Plaintiffs allege that American General promoted and marketed the Programs despite its knowledge of the Programs' noncompliance. Plaintiffs bring claims for (1) common law unfair competition (Count II); (2) misleading advertising under Florida Statute § 817.41 (Count III); (3) fraud by concealment (Count IV); (4) common law fraud (Count V); (5) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 -.23 (Count VII); (6) breach of fiduciary duty (Count VIII); (7) constructive fraud (Count IX); and (8) negligent misrepresentation (Count X).[1]
B. The Sea Nine VEBA Program
A VEBA is a tax-exempt association providing for medical, disability, life, and other benefits to association members. 26 U.S.C.A. § 501 (2015). The VEBAs at issue in this case were administered by Sea Nine Associates, Inc. ("Sea Nine") and were offered to small, closely-held business owners as a way to provide for employee life insurance policies (the "Sea Nine VEBA Program"). (Doc. 54, ¶ 4). Small business owners were advised to join the Sea Nine VEBA Programs and make supposedly tax-deductible contributions that the VEBA would then use to purchase life insurance policies. (Doc. 133, Pp. 1). Later, the business owners would take ownership of the policies and then either cash them out or borrow against them, again supposedly on a tax-free basis. (Id. at p. 1-2). Plaintiffs all consist of small business owners who participated in the Sea Nine VEBA Programs.
Unfortunately for Plaintiffs, the specific type of VEBA Programs administered in this case have been classified as "listed transactions" by IRS, meaning that they do not comply with federal law and are considered tax avoidance schemes. (Doc. 133, p. 2). In 2011, Plaintiffs began receiving letters from the IRS stating that the deductions that they claimed for contributions to the VEBAs had been made improperly and that Plaintiffs were required to pay back taxes and penalties for failing to notify the IRS that the VEBAs were listed transactions. (Id. at p. 8).
C. American General's Involvement
Plaintiffs allege that American General knew that the VEBAs were not tax compliant but still promoted the sale of insurance policies through the VEBAs. (Doc. 54, ¶ 5). According to Plaintiffs, agents of American General[2] were involved with the Sea Nine *1308 VEBA Programs during the 1990's and therefore knew that the Programs were illegal. (Doc. 133, p. 2). Despite this knowledge, they revived the Programs in 2002, at which time the VEBAs purchased life insurance policies from American General. (Doc. 133-30, 57:10-15).
According to Plaintiffs, senior executives of American General worked closely with the administrators of the VEBAs and aided in the marketing and promotion of the Programs. For example, executives of American General attended marketing meetings with clients and their advisors. (Doc. 133, p. 3). The Sea Nine VEBA administrators would refer potential clients to American General's senior counsel and head of advance sales, David Robinson ("Robinson"), to answer questions about the insurance policies included in the VEBA. (Doc. 133-31, 74:9-16). One individual involved in the administration of the Sea Nine VEBAs-Lalat Pattanaik ("Lalat")-testified that he believed that the advice given by Robinson "provided credibility" to the Sea Nine VEBA Program due to Robinson's extensive qualifications. (Id. at 73:21-25, 74:1).
American General also provided marketing materials to the VEBA administrators, including software that the VEBA administrators used to illustrate the potential benefits of participating in the VEBA Programs. (Id. at 103:18-104:15). The marketing materials provided by American General included an "advisor's guide," which is a technical informational document that provided information about the VEBA Program and the legal framework the programs are structured under. (Doc. 140-1). The American General advisor's guide was used frequently to educate financial advisors in hopes that those advisors "would then convince their clients to-to join [the Sea Nine] VEBA program and buy American General product." (Doc. 133-31, 61:12-15). American General also provided a less technical informational document that was used to share information about the Sea Nine VEBA Program to other clients. (Doc. 133-35). This document was described by Sea Nine marketer Lalat as "a great tool to engage other agents that had wealthy entrepreneurial clients." (Doc. 133-31, 62:25-63:2). Plaintiffs claim that the marketing materials provided by American General "enhanced the credibility of the VEBA program by giving it the imprimatur of one of the county's most well established insurance firms." (Doc. 133, p. 3).
Plaintiffs further contend that American General knew that the Sea Nine VEBA Programs were noncompliant with federal tax law, withheld that information from Plaintiffs and other potential clients, and continued to sell insurance policies to the VEBAs in spite of its noncompliance. In 2003, after the IRS tightened regulations governing VEBAs, Robinson asked Sea Nine employee Elliott to send documents showing that the Sea Nine VEBA Programs were compliant with the new regulations. (Doc. 133-40). Without ever receiving any confirming documentation, Robinson added the Sea Nine VEBA Programs to American General's list of regulatory compliant programs. (Doc. 133-43). Thereafter, Sea Nine submitted documents to American General, including a draft opinion letter from a tax attorney stating that the Sea Nine Programs did not comply with current regulations and that the plan documents would need to be amended. (Doc. 133-47). The plan documents were not immediately amended, (Doc. 133-30, 195:9-16); nevertheless, *1309 American General continued to issue policies to the Sea Nine VEBAs until February 2008, (Doc. 133-31, 21:4-9). Based on these facts, Plaintiffs contend that American General was aware that the Sea Nine VEBA Programs failed to comply with current federal tax regulations, and yet continued to market, promote, and sell policies through the noncompliant Sea Nine VEBA Programs.
D. Procedural History
This case was initiated in state court on August 14, 2015. On December 4, 2015, American General removed the action to this Court based on the Court's diversity jurisdiction. (Doc. 1). On February 9, 2016, the Court entered a Case Management and Scheduling Order ("CMSO"), establishing that the deadline to amend pleadings was April 4, 2016. (Doc. 35).
On April 4, 2016, the deadline for amended pleadings, Plaintiffs filed the First Amended Complaint, adding their spouses and employers as parties, and dropping a claim for rescission of contracts. (Doc. 41). The First Amended Complaint alleged several causes of action: Count I alleged a claim under Florida's RICO (Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. §§ 895.01 - 895.06. Count II alleged a claim for common law unfair competition. Count III asserted a misleading advertising claim under Florida Statute § 817.41. Count IV alleged a claim of fraud by concealment. Count V asserted a common law fraud claim. Count VI asserted a claim of aiding and abetting against American General. Count VII asserted a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 -.23. Count VIII asserted a claim for breach of fiduciary duty. Count IX asserted a claim for constructive fraud. Finally, Count X asserted a claim for negligent misrepresentation.
On May 2, 2016, American General filed a Motion to Strike, or in the Alternative, Motion to Dismiss the First Amended Complaint. (Doc. 44). On July 15, 2016, the Court granted American General's Motion to Dismiss for failing to plead with particularity. (Doc. 50). The Court granted leave to file a Second Amended Complaint.
On July 29, 2016, Plaintiffs filed the Second Amended Complaint, specifying their allegations against American General. On August 12, 2016, American General filed a Motion to Dismiss Plaintiffs' RICO claims, arguing that the alleged RICO enterprise is not distinct from American General. (Doc. 57).
On September 20, 2016, Plaintiffs moved for leave to amend in order to add federal RICO claims. On October 19, 2016, Magistrate Judge Spaulding denied Plaintiff's Motion for Leave to Amend, finding that Plaintiffs failed to show good cause why the federal RICO claims could not have been added to their Complaint in one of the two previous amendments. (Doc. 76).
On February 3, 2017, Magistrate Judge Spaulding submitted a Report and Recommendation (Doc. 80), recommending the Court grant American General's Motion to Dismiss the Second Amended Complaint, finding that Plaintiffs failed to allege an enterprise that is distinct from the entity alleged to have committed the violation. On March 30, 2017, the Court adopted Magistrate Judge Spaulding's Report and Recommendation and granted American General's Motion to Dismiss Counts I and VI of the Second Amended Complaint.
Plaintiffs now move for reconsideration of the Court's Order Granting Defendant's Motion to Dismiss. (Doc. 110). Plaintiffs contend that the Second Amended Complaint contains sufficient allegations to state a claim for a RICO violation and that the aiding and abetting claim relates to *1310 other counts in the Second Amended Complaint.
Also before the Court at this time is American General's Motion for Summary Judgment as to all Counts. (Doc. 115). Plaintiffs have responded in opposition to that motion, (Doc. 133), and American General replied, (Doc. 137).
II. STANDARDS OF REVIEW
A. Motion for Reconsideration
The Court may reconsider a non-final order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b) ; see also Bon Air Hotel, Inc. v. Time, Inc. , 426 F.2d 858, 862 (5th Cir. 1970). "The purpose of a motion for reconsideration is to correct manifest errors of law, to present newly discovered evidence, or to prevent manifest injustice." Merrett v. Liberty Mut. Ins. , No. 3:10-cv-1195-J-12MCR, 2013 WL 5289095, at *1 (M.D. Fla. Sept. 19, 2013) (quoting Horowitch v. Diamond Aircraft Indus., Inc. , No. 6:06-cv-1703-Orl-19KRS, 2009 WL 1537896, at *3 (M.D. Fla. June 2, 2009) ). It is the movant's burden to "set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." Horowitch , 2009 WL 1537896, at *3. A movant will generally meet this burden where he shows "(1) an intervening change in controlling law; (2) newly discovered evidence; or (3) the need to correct clear error or prevent manifest injustice." Voter Verified, Inc. v. Election Sys. & Software, Inc. , No. 6:09-cv-1969-ORL-19KRS, 2011 WL 3862450, at *2 (M.D. Fla. Aug. 31, 2011). Ultimately, reconsideration is an extraordinary remedy that should be granted sparingly. Id.
B. Motion for Summary Judgment
"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials," but may also consider any other material in the record. Fed. R. Civ. P. 56(c)(3).
A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. Id. The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of a genuine factual dispute. Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; Hickson Corp. v. N. Crossarm Co. , 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. Porter v. Ray , 461 F.3d 1315, 1320 (11th Cir. 2006).
To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact.
*1311 Crawford-El v. Britton , 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). In determining whether a genuine dispute of material fact exists, the court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. Skop v. City of Atlanta , 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita , 475 U.S. at 587, 106 S.Ct. 1348.
III. DISCUSSION
A. Motion for Reconsideration
The Court dismissed Plaintiffs' RICO claim (Count I) and aiding and abetting claim (Count VI) on March 30, 2017, for failing to plead a RICO "enterprise" that is separate and distinct from American General. (Doc. 107). Plaintiffs now ask the Court to reconsider its decision and allow Plaintiffs to maintain their RICO and aiding and abetting causes of action, or in the alternative, grant Plaintiffs leave to file a Third Amended Complaint.
1. Count 1-RICO Violation
Plaintiffs argue that dismissal of the RICO violation was improper because the Second Amended Complaint adequately alleges facts that establish that the members of the RICO enterprise were separate from American General and acted independently and pursued their own interests. (Doc. 110, p. 10). This argument, however, was already made in response to Defendant's Motion to Dismiss and fails to satisfy any of the three factors for the Court to reconsider its prior Order.
Nonetheless, the Court has reviewed the case law provided by Plaintiffs in support of their motion for reconsideration, and again finds that Plaintiffs failed to allege facts that would support that the alleged RICO members in this case are distinct from American General. Plaintiffs took great pains in the Second Amended Complaint to allege that the RICO members were all agents of American General and acted on its behalf. Plaintiffs refer to the RICO members as "agents" throughout the Complaint, stating that each member "acted as an agent, representative or employee of [American General]." (Doc. 54, pp. 9-11). In further support of its agency allegations, Plaintiffs assert that alleged RICO members, Innovative, Laban, and Elliott, filed "Notices of Agency Appointment" with the California Department of Insurance, officially designating themselves as authorized agents of American General. (Doc. 54, p.12). RICO members Innovative and Laban were designated as "Master General Agents" of American General pursuant to a contract with American General dated February 7, 2004. (Id. ). Plaintiffs also allege that "[t]he [alleged RICO members] received commission payments from [American General]" for policies sold through the Sea Nine VEBAs. (Id. ). All of these facts alleged in the Second Amended Complaint contradict Plaintiffs' argument that these individuals were acting independently from American General with regards to their involvement with the Sea Nine VEBA plans. The case law on the distinctness requirement for a RICO violation is clear and well-settled: where a complaint fails to allege facts that establish that the alleged RICO members were acting independently from the RICO person, there is no RICO violation. See, e.g. , Ray v. Spirit Airlines, Inc. , 836 F.3d 1340, 1357 (11th Cir. 2016) ("[A] corporate defendant acting through its officers, agents, and employees is simply a corporation. Labeling it as an enterprise as well would only amount to referring to the corporate 'person' by a different name."). The Court thus declines to reconsider its decision *1312 to dismiss Plaintiffs' claim for a RICO violation.
2. Count VI-Aiding and Abetting
Plaintiffs next argue that the Court erred in dismissing Plaintiffs' aiding and abetting claim because the claim related not only to the RICO violation, but other claims in the Second Amended Complaint as well. (Doc. 110, p. 17). Plaintiffs assert that the aiding and abetting claim also "includes allegations that Defendant American General is liable for aiding and abetting fraud and other causes of action." (Id. ).
In Florida, a cause of action for aiding and abetting requires "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abett[o]r; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." Lawrence v. Bank of Am., N.A. , 455 Fed.Appx. 904, 906 (11th Cir. 2012) (per curiam).
The Court notes that the only count specifically mentioned in Plaintiffs' aiding and abetting claim is the RICO violation. (Doc. 54, ¶ 133) ("Defendant knew that the conduct of the Agents ... constituted violations of RICO and/or breach of legal duties owed to Plaintiffs."). However, upon reexamination of Plaintiffs allegations set forth in the Second Amended Complaint, the Court finds that there are sufficient facts alleged to support a claim for aiding and abetting under Florida law. Accordingly, the Court will grant Plaintiffs' Motion for Reconsideration as to Plaintiff's aiding and abetting claim.
3. Leave to Amend
In their Motion for Reconsideration, Plaintiffs request leave to amend their complaint in order to more adequately allege their RICO claim. The Court notes that the Case Management and Scheduling Order for this case was entered on February 9, 2016, setting the deadline for amended pleadings on April 4, 2016. (Doc. 35). The Pretrial Conference for this case is quickly approaching on August 22, 2017, with trial set for the trial term beginning on September 5, 2017. Now, just weeks away from trial, Plaintiffs seek leave to amend their Complaint to address deficiencies in their allegations supporting a RICO violation.
Federal Rule of Civil Procedure 16 governs the district court's scheduling and management of cases. Of particular importance here, that rule provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Rule 16(b)(4)'s "good cause" standard is a rigorous one, focusing not on the good faith of or the potential prejudice to any party, but rather on the parties' diligence in complying with the court's scheduling order. Sosa v. Airprint Sys., Inc. , 133 F.3d 1417, 1418 (11th Cir. 1998) ; Febus-Cruz v. Sauri-Santiago , 652 F.Supp.2d 166, 170 n.3 (D.P.R. 2009). Indeed, "litigants cannot be permitted to treat a scheduling order as a 'frivolous piece of paper idly entered, which can be cavalierly disregarded without peril.' " O'Connell v. Hyatt Hotels of P.R. , 357 F.3d 152, 155 (1st Cir. 2004) ; see also Tower Ventures, Inc. v. Westfield , 296 F.3d 43, 45 (1st Cir. 2002) ("In an era of burgeoning case loads and thronged dockets, effective case management has become an essential tool for handling civil litigation.").
Plaintiffs fail to demonstrate "good cause" for modifying the scheduling order this late in the litigation. As explained in the Court's Order dismissing Counts I and VI, Plaintiffs have had two chances to amend their Complaint. Their failure to sufficiently plead allegations of a RICO violation or an aiding and abetting claim *1313 cannot be cured at this point in the litigation through an amended pleading. Accordingly, in an effort to maintain the integrity of the Court's schedule and case load, Plaintiffs' request for leave to amend the complaint is denied.
B. Motion for Summary Judgment
American General moves for summary judgment as to all remaining counts in the Second Amended Complaint. The Court will address each count in the most logical order.
1. Count II
Count II raises a claim for common law unfair competition. American General moves for summary judgment on Count II, arguing that Plaintiffs and American General are not competitors for a common pool of customers. Plaintiffs have not addressed their claim for unfair competition in their response to American General's Motion for Summary Judgment.
"To prevail on a claim for unfair competition under Florida common law, plaintiff must establish (1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion." Glob. Tel*Link Corp. v. Scott , 652 F.Supp.2d 1240, 1250 (M.D. Fla. 2009). "[T]he pleading party must allege that it competes with its opponent for a common pool of customers." Third Party Verification, Inc. v. Signaturelink, Inc. , 492 F.Supp.2d 1314, 1325 (M.D. Fla. 2007).
There are no facts alleged in the Second Amended Complaint, or found anywhere in the record, that suggest that Plaintiffs and American General compete for a common pool of customers. Plaintiffs all consist of small business owners who participated in the Sea Nine VEBA Programs in an attempt to obtain insurance benefits with tax advantages. (Doc. 54, ¶¶ 16-33). Plaintiffs have not explained how any of their businesses compete with American General for a common pool of customers. Accordingly, Plaintiffs have not met their burden of demonstrating that there are genuine factual disputes which preclude judgment as a matter of law on this issue. Summary judgment as to Count II will therefore be granted.
2. Count III
In Count III, Plaintiffs bring a claim under Florida's Misleading Advertising Law, Fla. Stat. § 817.41, contending that American General "publicly disseminated advertising regarding its Programs and Policies that contained statements that were fraudulent, untrue and/or misleading." (Doc. 54, ¶ 118). Florida's Misleading Advertising Law makes it unlawful "to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement." Fla. Stat. § 817.41. However, § 817.47 provides an exemption "for advertising in connection with sales of insurance which are regulated under the insurance laws of the state." American General seeks summary judgment as to Count III, claiming that its actions are exempt pursuant to § 817.47.
Plaintiffs contend that insurance exemption should not apply in this case because the advertisements at issue concerned a "welfare benefit trust"-the Sea Nine VEBA Program-and had only a tangential connection to "sales of insurance." (Doc. 133, p. 19). Such an argument, however, is contradicted by Plaintiffs' allegations in the Second Amended Complaint and other pleadings submitted by Plaintiffs. Plaintiffs' summary of their claim against American General begins by stating that "American General actively participated in a fraudulent scheme to sell highly profitable life insurance products" (Doc. 133, p. 1) (emphasis added). Indeed, all of the facts presented by Plaintiffs indicate that American General's participation in the Sea Nine VEBA Program centers *1314 around the sale of life insurance policies to the VEBAs. In its Complaint, Plaintiffs contend that American General participated in a "unified marketing scheme that promoted both its [insurance] Policies and the Programs," (Doc. 54, ¶ 50), and that it agreed with the Employees to sell "[insurance] Policies through the [Sea Nine VEBA] Programs," (id. ¶ 105). The crux of Plaintiffs entire suit against American General is that American General marketed, promoted, and sold insurance policies through the Sea Nine VEBA Programs after obtaining the knowledge that the Programs were noncompliant with federal law. Such claims contradict Plaintiffs assertion now that the advertisements at issue had only a tangential connection to "sales of insurance." (Doc. 133, p. 19).
Accordingly, the Court finds that the advertisements at issue in this case were made "in connection with the sales of insurance" and are exempt from Florida's Misleading Advertising Law. Summary Judgment as to Count III will granted.
3. Count VII
In Count VII, Plaintiffs bring a claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. § 501.204. FDUTPA also contains an exemption for insurance companies, providing that the statute does not apply "to any person or activity regulated under the laws administered by the former Department of Insurance which are now administered by the Department of Financial Services." Fla. Stat. § 501.212(4)(d). Because there is no dispute that American General is an insurance company as that term is defined under § 501.212(4)(d), there is no cause of action for violation of FDUTPA. See Antoine v. State Farm Mut. Auto. Ins. , 662 F.Supp.2d 1318, 1326 (M.D. Fla. 2009) (dismissing FDUTPA claim because "no cause of action may be maintained against [an insurance company] under the Florida Deceptive and Unfair Trade Practices Act"). Summary Judgment as to Count VII will be granted.
4. Counts IV and V
In Count IV, Plaintiffs bring a claim for fraud by concealment, alleging that American General
failed to disclose material facts to Plaintiffs and Agents, including that: (a) participants in prior versions of Defendant's VEBA Prgrams were audited by the IRS, had their deductions disallowed and were forced to pay penalties, back taxes and interest; (b) that Defendant's VEBA Programs were Listed Transactions that had to be disclosed to the IRS because they were the same or substantially similar to transactions determined to be unlawful tax avoidance schemes; and (c) Defendant's own lawyers advised them in writing that the Programs did not comply with [federal law].
(Doc. 54, ¶ 123). In Count V, Plaintiffs bring a claim for common law fraud, alleging that American General "made various misrepresentations of material fact to Plaintiffs ..., and did so with the intent to induce Plaintiffs to join the VEBA Programs, purchase Policies, and make substantial payments to Defendants." (Id. ¶ 128).
Claims for fraud by concealment and common law fraud share a common element of detrimental reliance. Both require the plaintiff to have detrimentally relied upon either a false statement of material fact (fraud),[3] or a concealed material *1315 fact (fraud by concealment),[4] made by the defendant.
American General argues that Plaintiffs did not rely on the facts provided by American General regarding the tax compliance of the VEBA Programs. (Doc. 115, pp. 15-16). In support of this argument, American General submitted agreements signed by a few of the Plaintiffs containing reliance disclosures that provide:
"The Policyowner acknowledges that he is not relying upon any representation, warranty or guarantee beyond those maintained within the insurance policy contract itself.... Further, the Policyholder acknowledges and confirms that he is relying on the advice of his own tax or legal advisor in making the decision to enter into any transaction in which this life insurance policy is utilized."
(Doc. 115-14). According to American General, these agreements demonstrate that Plaintiffs "understood the two-level nature of the VEBA transactions and were not relying on American General ... for tax advice, that they would obtain their own tax advice, and that they understood the tax risks of VEBA participation." (Doc. 115, p. 5).
American General claims that Florida courts "consistently enforce non-reliance language in executed documents in dismissing fraud-based claims." (Doc. 115, p. 16). Despite American General's contention, there seems to be disagreement amongst Florida courts on the issue of whether a non-reliance clause negates a claim for fraud. Compare Billington v. Ginn-La Pine Island, Ltd. , 192 So.3d 77, 84 (Fla. 5th DCA 2016) ("[W]e hold that the 'non-reliance' clauses in this case negate a claim for fraud in the inducement because Appellant cannot recant his contractual promises that he did not rely upon extrinsic representations."), with Lower Fees, Inc. v. Bankrate, Inc. , 74 So.3d 517, 520 (Fla. 4th DCA 2011) (holding that a non-reliance disclaimer was insufficient to defeat a claim for fraud in the inducement because "[i]t has been the law of this state for some time that a claim of fraud in the inducement will not be defeated by contract clauses"). The one thing Florida courts do agree on regarding non-reliance clauses is that they must be "sufficiently express, specific, and unambiguous with respect to the representation at issue." Le Macaron, LLC v. Le Macaron Dev. LLC , No. 8:16-CV-918-17TGW, 2016 WL 6211718, at *4 (M.D. Fla. Oct. 24, 2016). In fact, the Eleventh Circuit recently recognized that in order to negate a claim for fraud in Florida, a contract must "expressly state[ ] that it is incontestable on the ground of fraud." Glob. Quest, LLC v. Horizon Yachts, Inc. , 849 F.3d 1022, 1028 (11th Cir. 2017).
The Court finds that there are issues of fact that preclude summary judgment on this point. First, the non-reliance agreements provided by American General are not signed by all of the Plaintiffs. American General relies on language from the "Disclosure and Acknowledgement" clause from the VM5 VEBA Program-only one of the various Sea Nine VEBA Programs. Only five of the Plaintiffs participated in this particular program. Although American General contends that all of the Plaintiffs were "presented with a *1316 similar package of documents to review and sign," (Doc. 115, p. 4), the Court cannot determine based on the facts in the record that all Plaintiffs signed a non-reliance agreement. Moreover, the disclaimer language cited by American General indicates that it applies only to the "Policyowner," (Doc. 115-14), which according to the structure of the Programs was the VEBA, not the individual Plaintiffs. There is nothing in the record that clearly establishes that each Plaintiff agreed not to rely on tax compliance information provided by American General. Lastly, there is an issue of fact regarding the contractual privity between the Plaintiffs and American General, as the agreements provided by American General in support of its non-reliance argument are between Plaintiffs and their agents-American General is not a party to the contracts. It is not sufficiently clear that these contractual agreements can be interpreted to negate a claim of fraud against American General as a non-signatory. In sum, American General has not met its burden of demonstrating that there is no genuine dispute as to any material fact regarding the issue of fraud. Summary judgment as to Counts IV and V must, therefore, be denied.
5. Counts VIII and IX
In Count VIII, Plaintiffs bring a claim for breach of fiduciary duty, claiming that American General "held positions of confidentiality and mutual trust with Plaintiffs and voluntarily undertook and owed Plaintiffs a fiduciary duty to act in good faith for, or on behalf of, and, in the best interests of Plaintiffs individually." (Doc. 54, ¶ 151). Plaintiffs allege that American General breached its fiduciary duty by personally inducing Plaintiffs to invest money in insurance policies while concealing the illegal tax status of the Sea Nine VEBAs. (Id. ¶ 153).
In Count IX, Plaintiffs bring a claim for constructive fraud, contending that American General owed a fiduciary duty and a duty of fair dealing to Plaintiffs related to the business affairs surrounding the Sea Nine VEBAs, and that Plaintiffs were denied the benefit of their investment in American General policies as a result of fraud, self-dealing and concealment of American General's conflicts of interests. (Id. ¶¶ 162-63).
American General moves for summary judgment on both Counts VIII and IX, arguing that there generally is no fiduciary relationship between an insured and an insurer. (Doc. 133, p. 17). According to American General, Florida courts only recognize a duty of good faith, or a fiduciary obligation, when handling third-party claims. (Id. ) (citing Drilling Consultants, Inc. v. First Montauk Sec. Corp. , 806 F.Supp.2d 1228, 1238 (M.D. Fla. 2011) and Time Ins. Co. v. Burger , 712 So.2d 389, 391 (Fla. 1998) ). The Court finds this characterization of Florida's jurisprudence on fiduciary relationships oversimplified. See Berges v. Infinity Ins. , 896 So.2d 665, 672 (Fla. 2004) ("It has long been the law of this State that an insurer owes a duty of good faith to its insured.").[5]
*1317 Generally, "[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation." Restatement (Second) of Torts § 874 cmt. b (1979). In Florida, the fiduciary relationship has been described as follows:
The relation and duties involved need not be legal; they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief.
Doe v. Evans , 814 So.2d 370, 374 (Fla. 2002). It thus stands to reason that a fiduciary relationship will exist between an insured and an insurer where there is a special relation of trust and confidence between the parties. See, e.g. , Tiara Condo. Ass'n, Inc. v. Marsh, USA, Inc. , 991 F.Supp.2d 1271, 1281 (S.D. Fla. 2014) (explaining that "when an insurance broker encourages and engages in a 'special relationship' with its client, [it triggers] an enhanced duty of care to advise the client about the coverage"); 14 Couch on Ins. § 198:7 ("The relationship between the parties determines the extent of the duties owed to the insured."). Relevant factors that aid in the determination of whether a "special relationship" exists include the extent of the insurance company's involvement in the client's decision to purchase insurance, and whether the insurance company held itself out as having expertise in the field and the insured relied upon that expertise. Am. K-9 Detection Servs., Inc. v. Rutherford Int'l, Inc. , No. 614CV1988ORL37TBS, 2016 WL 2744958, at *13 (M.D. Fla. May 11, 2016). In the end, whether a fiduciary relationship exists is a question of fact for the jury. Id. ; Evans , 814 So.2d at 375 ("[I]t is a question for the jury to determine whether a fiduciary relationship arose.").
The Court finds issues of fact that preclude summary judgment on the question of whether American General owed Plaintiffs a fiduciary duty. Plaintiffs contend that American General created a "special relationship" that triggered a fiduciary duty through their superior knowledge and affirmative representations about the tax advantages of purchasing American General Policies through the Sea Nine VEBA program. (Doc. 133, p. 14). There is evidence in the record that American General provided marketing materials to Plaintiffs to promote the sale of its insurance policies through the Sea Nine VEBA programs. Of particular value was the "Advisors Guide" produced by American General which summarized the legal framework the Sea Nine VEBAs were allegedly structured under. These materials, which prominently featured American General's logo, worked to provide a level of credibility to the Sea Nine VEBA programs, and according to Plaintiffs, induced them into investing in the Sea Nine VEBAs. Despite American General's contention that there is no fiduciary relationship between an insurer and an insured during an arms-length sale of an insurance policy, see Drilling Consultants, Inc. v. First Montauk Sec. Corp. , 806 F.Supp.2d 1228, 1238 (M.D. Fla. 2011), the question of whether a fiduciary relationship exists based on the particular facts of this case is a question for the jury. Summary judgment on Counts VIII and IX will be denied.
6. Count X
In Count X, Plaintiffs bring a claim for negligent misrepresentation,[6] alleging that *1318 American General, acting through its agents and employees, made misrepresentations that it should have known were false; that it was American General's intention that Plaintiffs rely on those misrepresentations; and that the Plaintiffs did in fact rely on those misrepresentations and were injured. (Doc. 54, ¶¶ 167-71).
Plaintiffs allege that American General is vicariously liable for misrepresentations made through its agents and employees. (Id. ¶ 168). American General moves for summary judgment on Count X, arguing that the evidence in the record does not support a finding that the agents or employees were acting with actual or apparent authority when making the alleged misrepresentations, and that the lack of authority negates Plaintiffs' claim for negligent misrepresentation. (Doc. 115, pp. 21-26).
The Court notes that American General successfully argued to this Court that the agents in this case were acting on its behalf when seeking dismissal of Plaintiffs RICO claims. (Doc. 107). Now, on summary judgment, American General changes its position and claims that the agents were not acting within its authority in an attempt to dismiss Plaintiffs' misrepresentation claim. American General appears to claim an agency relationship when it suits them, and denies the existence of such a relationship when it does not. Based on American General's seemingly disingenuous change in positions, the Court is uninclined to find that the agents in this case were not acting with American General's authority. See New Hampshire v. Maine , 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.") (quoting Davis v. Wakelee , 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895) ).
Moreover, the Court finds that there are issues of fact that preclude summary judgment on the issue of agency. "Florida case law provides that an insurer may be held accountable for the actions of those whom it cloaks with 'apparent agency.' " Almerico v. RLI Ins. , 716 So.2d 774, 777 (Fla. 1998). Florida applies a three prong test to determine the existence of apparent agency: (1) whether there was a representation made by the principal; (2) whether a third party relied upon that representation; and (3) whether the third party relied on the representation to its detriment. Id. An agency relationship can be found where an insurance company "furnishes an insurance agent or agency with 'any blank forms, applications, stationery, or other supplies to be used in soliciting, negotiating, or effecting contracts of insurance.' " Id. (quoting Fla. Stat. § 626.342 ). The question of whether an agent acts with apparent authority is generally a question of fact for the jury to determine. Id. at 781 (citing Hughes v. Pierce , 141 So.2d 280, 285 (Fla. 1st DCA 1961) ).
In this case, the record indicates that American General provided its agents (whom the Court notes signed "Agent Contracts" with American General (see, e.g. , Doc. 115-19) ) with marketing materials featuring its logo that were used to *1319 market, promote, and sell American General insurance policies through the Sea Nine VEBA Programs. Further, American General attended marketing meetings with potential VEBA clients and their advisors. (Doc. 133, p. 3). The agents would refer potential clients to American General's senior counsel and head of advance sales to answer questions about the insurance policies included in the VEBA. (Doc. 133-31, 74:9-16).Based on the case law in Florida, these facts could be sufficient for a fact finder to find that the agents in this case were acting with the authority of American General when selling Sea Nine VEBA programs. Summary judgment on Count X will therefore be denied.
IV. CONCLUSION
For the foregoing reasons, it is ORDERED AND ADJUDGED as follows:
1. Plaintiffs' Motion for Reconsideration of the Court's Order on Defendant's Motion to Dismiss (Doc. 110), is GRANTED IN PART and DENIED IN PART . The Motion for Reconsideration is granted as to Count VI. The motion is otherwise denied.
2. The Court's Order of Dismissal of Count VI is VACATED .
3. Defendant's Motion for Summary Judgment (Doc. 115), is GRANTED IN PART and DENIED IN PART ; Summary Judgment is granted in favor of Defendant, American General, on Counts II, III, and VII. The motion is otherwise denied.
DONE AND ORDERED in Orlando, Florida, on August 1, 2017.

Plaintiff's claim under Florida's RICO (Racketeer Influenced and Corrupt Organization) Act (Count I) and claim for aiding and abetting (Count II) were previously dismissed from this action. (Doc. 107).

Plaintiffs allege that the Sea Nine VEBA Program was administered, marketed, and promoted by the following entities: Sea Nine; Kenneth Elliott ("Elliott"); Innovative Private Strategies & Insurance Services, Inc. ("Innovative"); Lalat Pattanaik ("Lalat") and Laban Pattanaik ("Laban") (collectively, the "Pattanaiks"); I.P.S. Private Advisors LLC ("IPS"); and Steve Ruff ("Ruff"). Plaintiffs refer to these entities collectively as American General's "Agents." (Doc. 54, ¶ 47).

The elements of fraud are: "(1) the defendant made a false statement about a material fact; (2) the defendant knew or should have known [the statement] was false; (3) the defendant made the statement with intent to induce reliance on it; and (4) because of her justifiable reliance on the statement, the plaintiff was injured." Dunkel v. Hamilton , No. 3:15-CV-949-J-34PDB, 2016 WL 4844662, at *11 (M.D. Fla. Aug. 8, 2016), report and recommendation adopted , No. 3:15-CV-949-J-34PDB, 2016 WL 4765740 (M.D. Fla. Sept. 13, 2016).

The elements of fraud by concealment are: "(1) the defendant concealed or failed to disclose a material fact; (2) the defendant knew or should have known the fact should be disclosed; (3) the defendant knew her concealment or failure to disclose would induce the plaintiff to act; (4) the defendant had a duty to disclose the fact; and (5) the plaintiff detrimentally relied on the misinformation." Dunkel , 2016 WL 4844662, at *11.

See also Rutledge R. Liles, Florida Insurance Bad Faith Law: Protecting Businesses and You , Fla. B.J., March 2011, at 8 (recognizing an insurer's common law duty of good faith, and "the well-established principle, recognized by both the courts and the legislature, that insurers owe a fiduciary duty to their insureds. These long-established tenets of insurance law are the cornerstones that ensure that businesses and individuals receive the benefit of the protection for which they bargained and paid in their insurance contract. Otherwise, insurance companies are without accountability and Florida's businesses, professionals, homeowners, and other insureds are left to pay the cost of careless and improper claims practices by insurers").

In Gilchrist Timber Co. v. ITT Rayonier, Inc. , 696 So.2d 334, 337 (Fla. 1997), the Florida Supreme Court adopted the Restatement (Second) of Torts' framework for negligent misrepresentation:
§ 552. Information Negligently Supplied for the Guidance of Others.
(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
Restatement (Second) of Torts § 552 (1977).